PUBLIC EMPLOYEES RETIREMENT SYSTEM OF
OHIO *v.* BETTS

No. 88–389. Argued March 28, 1989—Decided June 23, 1989

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 182.

*Andrew I. Sutter*, Assistant Attorney General of Ohio, argued the cause for appellant. With him on the briefs were *Anthony J. Celebrezze, Jr.*, Attorney General, and *Nancy J. Miller*.

*Robert F. Laufman* argued the cause for appellee. With him on the brief was *Alphonse A. Gerhardstein*.

*Christopher J. Wright* argued the cause for the Equal Employment Opportunity Commission as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Bryson, Deputy Solicitor General Merrill, Charles A. Shanor, Gwendolyn Young Reams*, and *Harry F. Tepker, Jr.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

The Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.* (1982 ed. and Supp. V), forbids arbitrary discrimination by public and private employers against employees on account of age. Under § 4(f)(2) of the Act, 29 U. S. C. § 623(f)(2), however, age-based employment decisions taken pursuant to the terms of "any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of" the Act, are exempt from the prohibitions of the ADEA. In the case before us, we must consider the meaning and scope of the § 4(f)(2) exemption.

---

\*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *Susan J. Forney*, Senior Deputy Attorney General, and *John G. Knorr III*, Chief Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Grace Berg Schaible* of Alaska, *Joseph I. Lieberman* of Connecticut, *Warren Price III* of Hawaii, *Cary Edwards* of New Jersey, *Kenneth O. Eikenberry* of Washington, and *Charles G. Brown* of West Virginia; for the Association of Private Pension and Welfare Plans by *Paul J. Ondrasik, Jr.*; for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell*, and *Ann Elizabeth Reesman;* and for the National Public Employers Labor Relations Association by *Glen G. Nager* and *Andrew M. Kramer*.

*Christopher G. Mackaronis* and *Cathy Ventrell-Monsees* filed a brief for the American Association of Retired Persons as *amicus curiae* urging affirmance.

*John K. Van de Kamp*, Attorney General of California, *N. Eugene Hill*, Assistant Attorney General, *Henry G. Ullerich*, Supervising Deputy Attorney General, and *Silvia M. Diaz*, Deputy Attorney General, filed a brief for the California State Teachers' Retirement System as *amicus curiae*.

I

A

In 1933, the State of Ohio established the Public Employees Retirement System of Ohio (PERS) to provide retirement benefits for state and local government employees. Public employers and employees covered by PERS make contributions to a fund maintained by PERS to pay benefits to covered employees. Under the PERS statutory scheme, two forms of monthly retirement benefits are available to public employees upon termination of their public employment. Age-and-service retirement benefits are paid to those employees who at the time of their retirement (1) have at least 5 years of service credit and are at least 60 years of age; (2) have 30 years of service credit; or (3) have 25 years of service credit and are at least 55 years of age. Ohio Rev. Code Ann. §§ 145.33, 145.34 (1984 and Supp. 1988). Disability retirement benefits are available to employees who suffer a permanent disability, have at least five years of total service credit, and are under the age of 60 at retirement. § 145.35. The requirement that disability retirees be under age 60 at the time of their retirement was included in the original PERS statute, and has remained unchanged since 1959.

Employees who take disability retirement are treated as if they are on leave of absence for the first five years of their retirement. Should their medical conditions improve during that time, they are entitled to be rehired. § 145.39. Employees receiving age-and-service retirement, on the other hand, are not placed on leave of absence, but they are permitted to apply for full-time employment with any public employer covered by PERS after 18 months of retirement. Ohio Rev. Code Ann. § 145.381(C) (1984). Once an individual retires on either age-and-service or disability retirement benefits, he or she continues to receive that type of benefit throughout retirement, regardless of age.

## B

Appellee June M. Betts was hired by the Hamilton County Board of Mental Retardation and Developmental Disabilities as a speech pathologist in 1978. The board is a public agency, and its employees are covered by PERS. In 1984, because of medical problems, appellee became unable to perform her job adequately and was reassigned to a less demanding position. Appellee's medical condition continued to deteriorate, however, and by May 1985, when appellee was 61 years of age, her employer concluded that she was no longer able to perform adequately in any employment capacity. Appellee was given the choice of retiring or undergoing medical testing to determine whether she should be placed on unpaid medical leave. She chose to retire, an option which gave her eligibility for age-and-service retirement benefits from PERS. Because she was over 60 at the time of retirement, however, appellee was denied disability retirement benefits, despite her medical condition.

Before 1976, the fact that appellee's age disqualified her for disability benefits would have had little practical significance, because the formula for calculating disability benefits was almost the same as the formula used to determine age-and-service benefits. In 1976, however, the PERS statutory scheme was amended to provide that disability retirement payments would in no event constitute less than 30 percent of the disability retiree's final average salary. Ohio Rev. Code Ann. § 145.36 (1984). No such floor applies in the case of employees receiving age-and-service retirement payments. The difference was of much significance in appellee's case: her age-and-service retirement benefits amount to $158.50 per month, but she would have received nearly twice that, some $355 per month, had she been permitted to take disability retirement instead.

Appellee filed an age discrimination charge against PERS with the Equal Employment Opportunity Commission

(EEOC), and filed suit in the United States District Court for the Southern District of Ohio, claiming that PERS' refusal to grant her application for disability retirement benefits violated the ADEA. The District Court found that PERS' retirement scheme was discriminatory on its face, in that it denied disability retirement benefits to certain employees on account of their age. *Betts* v. *Hamilton County Bd. of Mental Retardation*, 631 F. Supp. 1198, 1202–1203 (1986). The court rejected PERS' reliance on § 4(f)(2) of the ADEA, which exempts from the Act's prohibitions certain actions taken in observance of "the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the Act] . . . ." 29 U. S. C. § 623(f)(2). Relying on interpretive regulations promulgated by the EEOC, the District Court held that employee benefit plans qualify for the § 4(f)(2) exemption only if any age-related reductions in employee benefits are justified by the increased cost of providing those benefits to older employees. Because the PERS plan provided for a reduction in available benefits at age 60, a reduction not shown to be justified by considerations of increased cost, the court concluded that PERS' plan was not entitled to claim the protection of the § 4(f)(2) exemption. 631 F. Supp., at 1203–1204.[1]

A divided panel of the Court of Appeals affirmed. *Betts* v. *Hamilton County Bd. of Mental Retardation and Developmental Disabilities*, 848 F. 2d 692 (CA6 1988). The majority agreed with the District Court that the § 4(f)(2) exemption is available only to those retirement plans that can provide age-related cost justifications or "a substantial business purpose" for any age-based reduction in benefits. *Id.*, at 694. The

---

[1] The District Court also found that PERS' disability retirement plan was not covered by § 4(f)(2) because PERS' actions were not taken pursuant to the terms of the plan, and because the plan impermissibly permits or requires involuntary retirement on the basis of age. 631 F. Supp., at 1204–1205.

majority rejected PERS' reliance on *United Air Lines, Inc.*
v. *McMann,* 434 U. S. 192 (1977), which held that retirement
plans adopted prior to the enactment of the ADEA need not
be justified by any business purpose, concluding that Con-
gress had "expressly repudiated" this decision when it
amended the ADEA in 1978. 848 F. 2d, at 694. Because
PERS had failed to provide any evidence that its discrimina-
tion against older workers was justified by age-related cost
considerations, the majority concluded that summary judg-
ment was appropriate.

Judge Wellford dissented. Noting that PERS' plan was
adopted long before enactment of the ADEA, he argued that
under *United Air Lines, Inc.* v. *McMann, supra,* it could not
be a "subterfuge to evade the purposes" of the Act. Judge
Wellford rejected the EEOC's regulations requiring cost jus-
tifications for all age-based reductions in benefits, finding
that nothing in the statute's language imposed such a re-
quirement. We noted probable jurisdiction, 488 U. S. 907
(1988), and now reverse.

## II

Under § 4(a)(1) of the ADEA, it is unlawful for an employer

"to fail or refuse to hire or discharge any individual or
otherwise discriminate against any individual with re-
spect to his compensation, terms, conditions, or privi-
leges of employment, because of such individual's age."
29 U. S. C. § 623(a)(1).

Notwithstanding this general prohibition, however, § 4(f)(2)
of the ADEA provides that it is *not* unlawful for an employer

"to observe the terms of . . . any bona fide employee
benefit plan such as a retirement, pension, or insurance
plan, which is not a subterfuge to evade the purposes of
this chapter, except that no such employee benefit plan
shall excuse the failure to hire any individual, and no
such . . . employee benefit plan shall require or permit

the involuntary retirement of any individual . . . because of the age of such individual." 29 U. S. C. § 623(f)(2).

On its face, the PERS statutory scheme renders covered employees ineligible for disability retirement once they have attained age 60. Ohio Rev. Code Ann. § 145.35 (1984). PERS' refusal to grant appellee's application for disability benefits therefore qualifies as an action "to observe the terms of" the plan. All parties apparently concede, moreover, that PERS' plan is "bona fide," in that it "'exists and pays benefits.'" *McMann*, 434 U. S., at 194; see *id.*, at 206–207 (WHITE, J., concurring in judgment). Finally, whatever the precise meaning of the phrase "any . . . employee benefit plan such as a retirement, pension, or insurance plan," see *infra*, at 173–175, it is apparent that a disability retirement plan falls squarely within that category. Cf. 29 CFR § 1625.10(f)(1)(ii) (1988). Accordingly, PERS is entitled to the protection of the § 4(f)(2) exemption unless its plan is "a subterfuge to evade the purposes of" the Act.[2]

We first construed the meaning of "subterfuge" under § 4(f)(2) in *United Air Lines, Inc.* v. *McMann, supra.* In *McMann*, the employer's retirement plan required employees to retire at the age of 60. After being forced to retire by the terms of the plan, McMann sued under the ADEA, claiming that the forced retirement was a violation of the Act, and that the mandatory retirement provision was not protected by the § 4(f)(2) exemption because it was a subterfuge to evade the purposes of the Act.[3] We rejected both positions.

_____

[2] As a result of the 1978 amendments, § 4(f)(2) cannot be used to justify forced retirement on account of age. Appellee contends, and the District Court found, that appellee was forced to retire under the terms of PERS' plan, and that as a result § 4(f)(2) is unavailable to PERS. The Court of Appeals did not address this question, and we express no opinion on it, leaving its resolution to that court on remand.

[3] When *McMann* was decided, § 4(f)(2) did not contain the final clause excluding from its protection benefit plans that "require or permit the involuntary retirement of any individual . . . because of the age of such individual."

With respect to mandatory retirement, we found that the statutory language and legislative history provided no support for the proposition that Congress intended to forbid age-based mandatory retirement.

Turning to the claim that the mandatory retirement provision was a "subterfuge to evade the purposes of" the Act, we rejected the conclusion of the court below that forced retirement on the basis of age must be deemed a subterfuge absent some business or economic purpose for the age-based distinction. Instead, we held that the term "subterfuge" must be given its ordinary meaning as "a scheme, plan, stratagem, or artifice of evasion." *Id.*, at 203. Viewed in this light, the retirement plan at issue could not possibly be characterized as a subterfuge to evade the purposes of the Act, since it had been established in 1941, long before the Act was enacted. As we observed, "[t]o spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer. We reject any such *per se* rule requiring an employer to show an economic or business purpose in order to satisfy the subterfuge language of the Act." *Ibid.*

As an initial matter, appellee asserts that *McMann* is no longer good law. She points out that in 1978, less than a year after *McMann* was decided, Congress amended § 4(f)(2) to overrule *McMann*'s validation of mandatory retirement based on age. See Pub. L. 95–256, § 2(a), 92 Stat. 189. The result of that amendment was the addition of what now is the final clause of § 4(f)(2).

The legislative history of the 1978 amendment contains various references to the definition of subterfuge, and according to appellee these reveal clear congressional intent to disapprove the reasoning of *McMann*. The Conference Committee Report on the 1978 amendment, for example, expressly discusses and rejects *McMann*, stating that "[p]lan provisions in effect prior to the date of enactment are not exempt under section 4(f)(2) by virtue of the fact that they

antedate the act or these amendments." H. R. Conf. Rep. No. 95–950, p. 8 (1978). See also 124 Cong. Rec. 7881 (1978) (remarks of Rep. Hawkins) ("The conferees specifically disagree with the Supreme Court's holding and reasoning in [McMann], particularly its conclusion that an employee benefit plan which discriminates on the basis of age is protected by section 4(f)(2) because it predates the enactment of the ADEA"); id., at 8219 (remarks of Sen. Javits); id., at 7888 (remarks of Rep. Waxman).

PERS disputes appellee's interpretation of this legislative history, asserting that it refers only to benefit plans that permit involuntary retirement and not to the more general issue whether a pre-Act plan can be a subterfuge in other circumstances. We need not resolve this dispute, however. The 1978 amendment to the ADEA did not add a definition of the term "subterfuge" or modify the language of § 4(f)(2) in any way, other than by inserting the final clause forbidding mandatory retirement based on age. We have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute. See *Weinberger* v. *Rossi*, 456 U. S. 25, 35 (1982); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 118, and n. 13 (1980); *United States* v. *Southwestern Cable Co.*, 392 U. S. 157, 170 (1968); *Rainwater* v. *United States*, 356 U. S. 590, 593 (1958); see also *McMann*, *supra*, at 200, n. 7. Congress changed the specific result of *McMann* by adding a final clause to § 4(f)(2), but it did not change the controlling, general language of the statute. As Congress did not amend the relevant statutory language, we see no reason to depart from our holding in *McMann* that the term "subterfuge" is to be given its ordinary meaning, and that as a result an employee benefit plan adopted prior to enactment of the ADEA cannot be a subterfuge. See *EEOC* v. *Cargill, Inc.*, 855 F. 2d 682, 686 (CA10 1988); *EEOC* v. *County of Orange*, 837 F. 2d 420, 422 (CA9 1988).

According to PERS, our reaffirmation of *McMann* should resolve this case. The PERS system was established by statute in 1933, and the rule that employees over age 60 may not qualify for disability retirement benefits has remained unchanged since 1959. The ADEA was not made applicable to the States until 1974. See Pub. L. 93–259, § 28(a)(2), 88 Stat. 74, codified at 29 U. S. C. § 630(b)(2). Since the age-60 requirement predates application of the ADEA to PERS, PERS argues that, under *McMann*, its plan cannot be a subterfuge to evade the purposes of the ADEA.

While *McMann* remains of considerable relevance to our decision here, we reject the argument that it is dispositive. It is true that the age-60 rule was adopted before 1974, and is thus insulated under *McMann* from challenge as a subterfuge. The plan provision attacked by appellee, however, is the rule that disability retirees automatically receive a minimum of 30 percent of their final average salary upon retirement, while disabled employees who retire after age 60 do not. The 30 percent floor was not added to the plan until 1976, and to the extent this new rule increased the age-based disparity caused by the pre-Act age limitation, *McMann* does not insulate it from challenge. See *EEOC* v. *Cargill, supra,* at 686, n. 4; *EEOC* v. *County of Orange, supra,* at 423; *EEOC* v. *Home Ins. Co.,* 672 F. 2d 252, 259, and n. 9 (CA2 1982). No "remarkable prescience" would have been required of PERS in 1976 for it to formulate the necessary intent to evade the ADEA, and thus the automatic rule of *McMann* is inapplicable. See 434 U. S., at 203. Accordingly, we must turn to an inquiry into the precise meaning of the § 4(f)(2) exemption in the context of post-Act plans.

## III

Appellee and her *amici* say that § 4(f)(2) protects age-based distinctions in employee benefit plans only when justified by the increased cost of benefits for older workers. They cite an interpretive regulation promulgated by the De-

partment of Labor, the agency initially charged with enforcing the Act, in 1979. 44 Fed. Reg. 30658–30662 (1979), codified at 29 CFR § 860.120 (1980), redesignated 29 CFR § 1625.10 (1988). The regulation recites that the purpose of the exemption "is to permit age-based reductions in employee benefit plans where such reductions are justified by significant cost considerations," and that "benefit levels for older workers may be reduced to the extent necessary to achieve approximate equivalency in cost for older and younger workers." § 1625.10(a)(1). With respect to disability benefits in particular, the regulation provides that "[r]eductions on the basis of age in the level or duration of benefits available for disability are justifiable only on the basis of age-related cost considerations . . . ." § 1625.10(f)(1)(ii). Under these provisions, employers may reduce the value of the benefits provided to older workers as necessary to equalize costs for workers of all ages, but they cannot exclude older workers from the coverage of their benefit plans altogether.

The requirement that employers show a cost-based justification for age-related reductions in benefits appears nowhere in the statute itself. The EEOC as *amicus* contends that this rule can be drawn either from the statutory requirement that age-based distinctions in benefit plans not be a subterfuge to evade the purposes of the Act, or from the portion of § 4(f)(2) limiting its scope to actions taken pursuant to "any bona fide employee benefit plan such as a retirement, pension, or insurance plan." Brief for EEOC as *Amicus Curiae* 9–14. We consider these alternatives in turn.

## A

The regulations define "subterfuge" as follows: "In general, a plan or plan provision which prescribes lower benefits for older employees on account of age is not a 'subterfuge' within the meaning of section 4(f)(2), provided that the lower level of benefits is justified by age-related cost considerations." 29 CFR § 1625.10(d) (1988). Various lower courts

have accepted this definition. *E. g.*, *EEOC* v. *Mt. Lebanon*, 842 F. 2d 1480, 1489 (CA3 1988); see also *Cipriano* v. *Board of Education of North Tonawanda School Dist.*, 785 F. 2d 51, 57–58 (CA2 1986). As the analysis in *McMann* makes apparent, however, this approach to the definition of subterfuge cannot be squared with the plain language of the statute. Although *McMann*'s holding, that pre-Act plans can never be a subterfuge, is not dispositive here, its reasoning is nonetheless controlling, for we stated in that case that "subterfuge" means "a scheme, plan, stratagem, or artifice of evasion," which, in the context of § 4(f)(2), connotes a specific "intent . . . to evade a statutory requirement." 434 U. S., at 203. The term thus includes a subjective element that the regulation's objective cost-justification requirement fails to acknowledge.

Ignoring this inconsistency with the plain language of the statute, appellee and the EEOC suggest that the regulation represents a contemporaneous and consistent interpretation of the ADEA by the agencies responsible for the Act's enforcement and is therefore entitled to special deference. See *EEOC* v. *Associated Dry Goods Corp.*, 449 U. S. 590, 600, n. 17 (1981); see also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). But, of course, no deference is due to agency interpretations at odds with the plain language of the statute itself. Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.

Contrary to the suggestion of the EEOC and appellee, moreover, the cost-justification requirement was not adopted contemporaneously with enactment of the ADEA. The cost-justification rule had its genesis in an interpretive bulletin issued by the Department of Labor in January 1969. 34 Fed. Reg. 322, 323, codified at 29 CFR § 860.120(a) (1970). To be sure, that regulation provided that plans which reduced benefits on the basis of age would "be considered in compliance with the statute" if the benefit reductions were justified

by age-related cost considerations, but it did not purport to exclude from the § 4(f)(2) exemption all plans that could not meet a cost-justification requirement.[4] Rather, this original version of the cost-justification rule was nothing more than a safe harbor, a nonexclusive objective test for employers to use in determining whether they could be certain of qualifying for the § 4(f)(2) exemption. It was not until 1979 that this regulatory safe harbor was transformed into the exclusive means of escaping classification as a subterfuge.

Appellee and her *amici* rely in large part on the legislative history of the ADEA and the 1978 amendments. In view of our interpretation of the plain statutory language of the subterfuge requirement, however, this reliance on legislative history is misplaced. See *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803, 808, n. 3 (1989); *McMann,* 434 U. S., at 199. The "subterfuge" exception to the § 4(f)(2) exemption cannot be limited in the manner suggested by the regulation.

---

[4] As originally promulgated in January 1969, the regulation provided:

"Section 4(f)(2) of the Act provides that it is not unlawful for an employer, employment agency, or labor organization 'to observe the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this Act, except that no such employee benefit plan shall excuse the failure to hire any individual . . . .' Thus, an employer is not required to provide older workers who are otherwise protected by the law with the same pension, retirement or insurance benefits as he provides to younger workers, so long as any differential between them is in accordance with the terms of a bona fide benefit plan. For example, an employer may provide lesser amounts of insurance coverage under a group insurance plan to older workers than he does to younger workers, where the plan is not a subterfuge to evade the purposes of the Act. A retirement, pension or insurance plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of pension or retirement benefits, or insurance coverage." 29 CFR § 860.120(a) (1970).

## B

The second possible source of authority for the cost-justification rule is the statute's requirement that the §4(f)(2) exemption be available only in the case of "any bona fide employee benefit plan such as a retirement, pension, or insurance plan." The EEOC argues, and some courts have held, that the phrase "such as a retirement, pension, or insurance plan" is intended to limit the protection of §4(f)(2) to those plans which have a cost justification for all age-based differentials in benefits. See *EEOC* v. *Westinghouse Electric Corp.*, 725 F. 2d 211, 224 (CA3 1983), cert. denied, 469 U. S. 820 (1984); *EEOC* v. *Borden's, Inc.*, 724 F. 2d 1390, 1396 (CA9 1984). The argument is as follows: the types of plans listed in the statute share the common characteristic that the cost of the benefits they provide generally rises with the age of their beneficiaries. This common characteristic suggests that Congress intended the §4(f)(2) exemption to cover only those plans in which costs rise with age. The obvious explanation for the limitation on the scope of §4(f)(2), the argument continues, is that the purpose of the exemption is to permit employers to reduce overall benefits paid to older workers only to the extent necessary to equalize costs for older and younger workers.

There are a number of difficulties with this explanation for the cost-justification requirement. Perhaps most obvious, it requires us to read a great deal into the language of this clause of §4(f)(2), language that appears on its face to be nothing more than a listing of the general types of plans that fall within the category of "employee benefit plan." The statute's use of the phrase *"any* employee benefit plan" seems to imply a broad scope for the statutory exemption, and the "such as" clause suggests enumeration by way of example, not an exclusive listing. Nor is it by any means ap-

parent that the types of plans mentioned were intentionally selected because the cost to the employer of the benefits provided by these plans tends to increase with age. Indeed, many plans that fall within these categories do not share that particular attribute at all, defined-contribution pension plans perhaps being the most obvious example.[5] We find it quite difficult to believe that Congress would have chosen such a circuitous route to the result urged by appellee and the EEOC.

The interpretation is weakened further by the fact that the regulation itself does not support it. According to 29 CFR § 1625.10(b) (1988), "[a]n 'employee benefit plan' is a plan, such as a retirement, pension, or insurance plan, which provides employees with what are frequently referred to as 'fringe benefits.'" This definition makes no mention of the limitation urged by the EEOC, and indeed seems sufficiently broad to encompass a wide variety of plans providing fringe benefits to employees, regardless of whether the cost of those benefits increases with age. The regulation's discussion of the cost-justification requirement is reserved for the subsection defining "subterfuge." § 1625.10(d).[6] Under these

---

[5] A defined contribution plan is one in which "the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide." *Alabama Power Co.* v. *Davis*, 431 U. S. 581, 593, n. 18 (1977); see 29 U. S. C. § 1002(34). Under this type of plan, the cost of making contributions for any given employee is completely unrelated to that employee's age. The dissent therefore is quite wrong to suggest that these plans "commonly—indeed, almost invariably—entail costs that rise with the age of the beneficiary. . . ." *Post*, at 187.

[6] Regulations issued by the Department of Labor in 1969 did provide that "[n]ot all employee benefit plans but only those similar to the kind enumerated in section 4(f)(2) of the Act come within this provision." 34 Fed. Reg. 9708, 9709 (1969), codified at 29 CFR § 860.120(b) (1970). Accordingly, the regulations suggested that "a profit-sharing plan as such would not appear to be within [the] terms" of § 4(f)(2). *Ibid.* According to the EEOC, this provision reflects the Department's conclusion that § 4(f)(2) "would not shield discrimination against older employees in the provision of

circumstances, this aspect of the EEOC's argument is entitled to little, if any, deference. Cf. *Bowen* v. *Georgetown University Hospital*, 488 U. S. 204, 212–213 (1988).

For these reasons, we conclude that the phrase "any bona fide employee benefit plan such as a retirement, pension, or insurance plan" cannot reasonably be limited to benefit plans in which all age-based reductions in benefits are justified by age-related cost considerations. Accordingly, the interpretive regulation construing § 4(f)(2) to include a cost-justification requirement is contrary to the plain language of the statute and is invalid.

## IV

Having established that the EEOC's definition of subterfuge is invalid, we turn to the somewhat more difficult task of determining the precise meaning of the term as applied to post-Act plans. We begin, as always, with the language of the statute itself.

The protection of § 4(f)(2) is unavailable to any employee benefit plan "which is a subterfuge to evade the purposes of" the Act. As set forth in § 2(b) of the ADEA, the purposes of

---

profit-sharing benefits because the cost of providing those benefits does not increase as employees age." Brief for EEOC as *Amicus Curiae* 10–11 n. 4. Nothing in the regulation suggested, however, that the reason for the exclusion of profit-sharing plans was that such plans were not characterized by increasing costs with age. To the contrary, it seems clear that the Department of Labor viewed the § 4(f)(2) exemption as applicable to plans that served the purpose of retirement, pension, or insurance plans, regardless of whether the cost of the benefits provided by such plans rose with the age of their beneficiaries:

"However, where it is the essential purpose of a plan financed from profits to provide retirement benefits for employees, the exception may apply. The 'bona fides' of such plans will be considered on the basis of all the particular facts and circumstances." 29 CFR § 860.120(b) (1970).

We express no opinion, of course, on the precise meaning of the phrase "any bona fide employee benefit plan such as a retirement, pension, or insurance plan." We hold only that it does not support the cost-justification requirement urged by appellee and the EEOC.

the Act are "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U. S. C. § 621(b). On the facts of this case, the only purpose that the PERS plan could be a "subterfuge to evade" is the goal of eliminating "arbitrary age discrimination in employment."

As the presence of the various exemptions and affirmative defenses contained in § 4(f) illustrates, Congress recognized that not all age discrimination in employment is "arbitrary." In order to determine the type of age discrimination that Congress sought to eliminate as arbitrary, we must look for guidance to the substantive prohibitions of the Act itself, for these provide the best evidence of the nature of the evils Congress sought to eradicate. Indeed, our decision in *McMann* compels this approach, for it rejected the contention that the purposes of the Act can be distinguished from the Act itself: "The distinction relied on is untenable because the Act is the vehicle by which its purposes are expressed and carried out; it is difficult to conceive of a subterfuge to evade the one which does not also evade the other." 434 U. S., at 198. Accordingly, a post-Act plan cannot be a subterfuge to evade the ADEA's purpose of banning arbitrary age discrimination unless it discriminates in a manner forbidden by the substantive provisions of the Act.

Section 4(a), the ADEA's primary enforcement mechanism against age discrimination by employers, forbids employers

"(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise ad-

versely affect his status as an employee, because of such individual's age; or

"(3) to reduce the wage rate of any employee in order to comply with this chapter." 29 U. S. C. § 623(a).

The phrase "compensation, terms, conditions, or privileges of employment" in § 4(a)(1) can be read to encompass employee benefit plans of the type covered by § 4(f)(2). Such an interpretation, however, would in effect render the § 4(f)(2) exemption nugatory with respect to post-Act plans. Any benefit plan that by its terms mandated discrimination against older workers would also be facially irreconcilable with the prohibitions in § 4(a)(1) and, therefore, with the purposes of the Act itself. It is difficult to see how a plan provision that expressly mandates disparate treatment of older workers in a manner inconsistent with the purposes of the Act could be said not to be a subterfuge to evade those purposes, at least where the plan provision was adopted after enactment of the ADEA.

On the other hand, if § 4(f)(2) is viewed as exempting the provisions of a bona fide benefit plan from the purview of the ADEA so long as the plan is not a method of discriminating in other, non-fringe-benefit aspects of the employment relationship, both statutory provisions can be given effect. This interpretation of the ADEA would reflect a congressional judgment that age-based restrictions in the employee benefit plans covered by § 4(f)(2) do not constitute the "arbitrary age discrimination in employment" that Congress sought to prohibit in enacting the ADEA. Instead, under this construction of the statute, Congress left the employee benefit battle for another day, and legislated only as to hiring and firing, wages and salaries, and other non-fringe-benefit terms and conditions of employment.

To be sure, this construction of the words of the statute is not the only plausible one. But the alternative interpretation would eviscerate § 4(f)(2). As JUSTICE WHITE wrote in his separate concurrence in *McMann*, "[b]ecause all retire-

ment plans necessarily make distinctions based on age, I fail to see how the subterfuge language, which was included in the original version of the bill and was carried all the way through, could have been intended to impose a requirement which almost no retirement plan could meet." 434 U. S., at 207.

Not surprisingly, the legislative history does not support such a self-defeating interpretation, but to the contrary shows that Congress envisioned a far broader role for the § 4(f)(2) exemption. When S. 830, the bill that was to become the ADEA, was originally proposed by the administration in January 1967, it contained no general exemption for benefit plans that differentiated in benefits based on age.[7] Senator Javits, one of the principal moving forces behind enactment of age discrimination legislation, generally favored the administration's bill, but believed that a broader exemption for employee benefit plans was needed. Accordingly, he proposed an amendment substantially along the lines of present-day § 4(f)(2). 113 Cong. Rec. 7077 (1967).

One factor motivating Senator Javits' amendment was the concern that, absent some exemption for benefit plans, the Act might "actually encourage employers, faced with the necessity of paying greatly increased premiums, to look for excuses not to hire older workers when they might have done so under a law granting them a degree of flexibility with respect to such matters." *Id.*, at 7076.[8] Reducing the cost of

---

[7] The administration bill's version of § 4(f)(2) provided that "[i]t shall not be unlawful for an employer, employment agency, or labor organization . . . to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act." 113 Cong. Rec. 2794 (1967).

[8] Elsewhere, Senator Javits explained that under his version of § 4(f)(2) "an employer will not be compelled to afford older workers exactly the same pension, retirement, or insurance benefits as younger workers and thus employers will not, because of the often extremely high cost of providing certain types of benefits to older workers, actually be discouraged from hiring older workers." *Id.*, at 31254–31255.

hiring older workers was not the only purpose of the proposed amendment, however. Its goals were far more comprehensive. As Senator Javits put it, "the age discrimination law is not the proper place to fight" the battle of ensuring "adequate pension benefits for older workers," and § 4(f)(2) was therefore intended to be "a fairly broad exemption . . . for bona fide retirement and seniority systems." *Ibid.* Later, referring to the effect of his proposed amendment on the provisions of employee benefit plans, Senator Javits stated that "[i]f the older worker chooses to waive all of those provisions, then the older worker can obtain the benefits of this act . . . ." *Id.*, at 31255. And finally, in his individual views accompanying the Senate Report on S. 830, Senator Javits observed: "I believe the bill has also been improved by the adoption of language, based on an amendment which I had offered, *exempting the observance of bona fide seniority systems and retirement, pension, or other employment benefit plans from its prohibitions.*" S. Rep. No. 723, 90th Cong., 1st Sess., 14 (1967) (emphasis added).

Other Members of Congress expressed similar views. Senator Yarborough, the principal sponsor and floor manager of the administration bill, observed that § 4(f)(2), "when it refers to retirement, pension, or insurance plan, . . . means that a man who would not have been employed except for this law does not have to receive the benefits of the plan." 113 Cong. Rec. 31255 (1967). Indeed, at least one Congressman opposed the ADEA precisely because it permitted employers to exclude older employees from participation in benefit plans altogether when the terms of the plans mandated that result. *Id.*, at 34745 (remarks of Rep. Smith).

While the Committee Reports on the ADEA do not address the matter in any detail, they do state that § 4(f)(2) "serves to emphasize the primary purpose of the bill—hiring of older workers—by permitting employment without necessarily including such workers in employee benefit plans." S. Rep. No. 723, *supra*, at 4; H. R. Rep. No. 805, 90th

Cong., 1st Sess., 4 (1967). That explanation does not support a narrow reading of the § 4(f)(2) exemption. The Committee Reports, moreover, refute a reading of § 4(f)(2) that would limit its protection to pre-Act plans, for they make it clear that the exemption "applies to new and existing employee benefit plans, and to both the establishment and maintenance of such plans." S. Rep. No. 723, *supra*, at 4; H. R. Rep. No. 805, *supra*, at 4. In short, the legislative history confirms that the broader reading of § 4(f)(2) is the correct one, and that Congress intended to exempt employee benefit plans from the coverage of the Act except to the extent plans were used as a subterfuge for age discrimination in other aspects of the employment relation.

While this result permits employers wide latitude in structuring employee benefit plans, it does not render the "not a subterfuge" proviso a dead letter. Any attempt to avoid the prohibitions of the Act by cloaking forbidden discrimination in the guise of age-based differentials in benefits will fall outside the § 4(f)(2) exemption. Examples of possible violations of this kind can be given. Under § 4(d) of the ADEA, for example, it is unlawful for an employer to discriminate against an employee who has "opposed any action made unlawful by" the Act or has participated in the filing of any age-discrimination complaints or litigation. Nothing in § 4(f)(2) would insulate from liability an employer who adopted a plan provision formulated to retaliate against such an employee. See 29 CFR § 1625.10(d)(5) (1988). Similarly, while § 4(f)(2) generally protects age-based reductions in fringe benefits, an employer's decision to reduce salaries for all employees while substantially increasing benefits for younger workers might give rise to an inference that the employer was in fact utilizing its benefits plan as a subterfuge for age-based discrimination in wages, an activity forbidden by § 4(a)(1). These examples are not exhaustive, but suffice to illustrate the not-insignificant protections provided to older employees by the subterfuge proviso in the § 4(f)(2) exemption.

## V

As construed above, § 4(f)(2) is not so much a defense to a charge of age discrimination as it is a description of the type of employer conduct that is prohibited in the employee benefit plan context. By requiring a showing of actual intent to discriminate in those aspects of the employment relationship protected by the provisions of the ADEA, § 4(f)(2) redefines the elements of a plaintiff's prima facie case instead of establishing a defense to what otherwise would be a violation of the Act. Thus, when an employee seeks to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non-fringe-benefit aspect of the employment relation.

This result is supported by our longstanding interpretation of the analogous provision of Title VII, the statute from which "the prohibitions of the ADEA were derived *in haec verba.*" *Lorillard* v. *Pons,* 434 U. S. 575, 584 (1978). Section 703(h) of Title VII states that

> "[n]otwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ." 42 U. S. C. § 2000e–2(h).

Despite the fact that § 703(h), like § 4(f)(2), appears on first reading to describe an affirmative defense, we have "regarded [§ 703(h)] not as a defense . . . but as a provision that itself 'delineates which employment practices are illegal and thereby prohibited and which are not.'" *Lorance* v. *AT&T Technologies, Inc.,* 490 U. S. 900, 908 (1989) (quoting *Franks*

v. *Bowman Transportation Co.*, 424 U. S. 747, 758 (1976)). Although the use of the phrase "subterfuge to evade the purposes of [the Act]" in § 4(f)(2) renders the scope of its protection for employee benefit plans broader than the scope of the protection for seniority systems provided by § 703(h), the similar structure and purpose of the two provisions supports the conclusion that ADEA plaintiffs must bear the burden of showing subterfuge.

Applying this structure to the facts here, it follows that PERS' disability retirement plan is the type of plan subject to the § 4(f)(2) exemption, and PERS' refusal to grant appellee's request for disability benefits was required by the terms of the plan. Because appellee has failed to meet her burden of proving that the reduction in benefits at age 60 was the result of an intent to discriminate in some non-fringe-benefit aspect of the employment relation, summary judgment for appellee was inappropriate. On remand, the District Court should give appellee an opportunity to demonstrate the existence of a genuine issue of material fact on this issue. See *Celotex Corp.* v. *Catrett*, 477 U. S. 317 (1986). The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The majority today immunizes virtually all employee benefit programs from liability under the Age Discrimination in Employment Act of 1967 (ADEA or Act), 29 U. S. C. § 621 *et seq.* (1982 ed. and Supp. V). Henceforth, liability will not attach under the ADEA even if an employer is unable to put forth any justification for denying older workers the benefits younger ones receive, and indeed, even if his only reason for discriminating against older workers in benefits is his abject hostility to, or his unfounded stereotypes, of them. In reaching this surprising result, the majority casts aside the esti-

mable wisdom of all five Courts of Appeals to consider the ADEA's applicability to benefit programs, of the two federal agencies which have administered the Act, and of the Acting Solicitor General on behalf of the Equal Employment Opportunity Commission (EEOC) as *amicus curiae*, all of whom have concluded that it contravenes the text and history of the Act to immunize discrimination against older workers in benefit plans which is not justified by any business purpose. Agreeing with these authorities, and finding the majority's "plain language" interpretation impossibly tortured and antithetical to the ADEA's goal of eradicating baseless discrimination against older workers, I dissent.

It is common ground that appellant Public Employees Retirement System of Ohio (PERS) discriminated against appellee June Betts on account of her age. *Ante*, at 163–165. Had Betts become disabled before, rather than after, turning 60, PERS would be paying her $355.02 a month in disability benefits for the rest of her life, more than double the $158.50 a month she is now entitled to collect. It is also common ground that PERS' facially discriminatory provision was enacted after the ADEA's passage in 1967, and therefore is subject to the Act's broad antidiscrimination command, § 4(a)(1), 29 U. S. C. § 623(a)(1), *ante*, at 169,[1] and that PERS is liable to Betts for the difference between the monthly sums noted above unless PERS' benefit plan falls within the § 4(f)(2) exemption, 29 U. S. C. § 623(f)(2). *Ante*, at 165–166. Finally, it is common ground that, based on PERS' refusal to offer any explanation for the age-specific benefits it provides, its disparate treatment of older employees lacked any business justification whatsoever; indeed, the cost to PERS of its disability plan varied not at all with an employee's age. *Ante*,

---

[1] I agree with the majority that neither our decision in *United Air Lines, Inc.* v. *McMann*, 434 U. S. 192 (1977), involving a plan with a mandatory retirement provision adopted prior to the passage of the ADEA, nor Congress' 1978 amendment of § 4(f)(2) in response to *McMann*, controls this case. *Ante*, at 167–169.

at 164–165.[2] For want of a better explanation, one is left to conclude that PERS denied benefits to those employees who became disabled after turning 60 solely because it wished to cut its overall disability outlays—and that PERS viewed older workers as a convenient target for its budgetary belt tightening.

This case thus presents the issue whether a benefit plan which arbitrarily imposes disparate burdens on older workers can claim succor under § 4(f)(2) from age discrimination liability. The majority arrives at the novel conclusion that the ADEA exempts from liability all discriminatory benefit programs, regardless of their justification, unless the discrimination implicates aspects of the employment relationship unrelated to the provision of benefits, and then only if the discrimination violates "the substantive provisions of the Act." *Ante*, at 176. The majority acknowledges that this reading shelters from the ADEA's purview all but a few hypothetical types of benefit plan age discrimination,[3] leaving older workers unprotected from baseless discrimination insofar as it affects the often considerable portion of overall compensation comprised by employee benefits. *Ante*, at 177, 181. The majority thus scuttles the heretofore consensus, and in my view correct, interpretation that the § 4(f)(2) ex-

---

[2] It is no answer to surmise that providing disability benefits to an older worker costs more than providing equivalent benefits to a younger worker, as is typically the case with life insurance benefits. PERS, after all, provided full monthly benefits to employees over 60, so long as they had become disabled prior to attaining that age. The sole distinction PERS drew was based on an employee's age at disability, a factor that does not correlate with the cost to an employer of providing benefits. Indeed, insofar as an employer is concerned about the cumulative cost of providing benefits during the remaining life of a disabled employee, this concern militates *in favor of* older workers, whose predicted lifespans are shorter than those of younger workers.

[3] For example, if an employer refuses to provide benefits to an older worker in retaliation for filing a claim under the ADEA, a claim challenging that refusal would be cognizable. *Ante*, at 180.

emption is limited to those programs whose disparate treatment is justified by a plausible business purpose.

To reach the result it does, the majority uses an interpretive methodology, purportedly one parsing § 4(f)(2)'s "plain language," which is so manipulative as virtually to invite the charge of result-orientation. Ordinarily, we ascertain the meaning of a statutory provision by looking to its text, and, if the statutory language is unclear, to its legislative history. *Blum* v. *Stenson,* 465 U. S. 886, 896 (1984). Where these barometers offer ambiguous guidance as to Congress' intent, we defer to the interpretations of the provision articulated by the agencies responsible for its enforcement, so long as these agency interpretations are "based on a permissible construction of the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 843 (1984); see also *Bethesda Hospital Assn.* v. *Bowen,* 485 U. S. 399, 403 (1988); *K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 291 (1988).

Eschewing this approach, the majority begins its analysis not by seeking to glean meaning from the statute, but by launching a no-holds-barred attack on the business purpose reading of § 4(f)(2). *Ante,* at 169–170. Disaggregating the sentence that is § 4(f)(2)[4] into two portions, the majority concludes that the business purpose test is irreconcilable with the "plain language" of the "subterfuge" portion, *ante,* at 170–172, and also cannot be inferred from the text of the portion enumerating types of employee benefit plans, *ante,* at 173–175. En route to interring the consensus interpretation of § 4(f)(2), the majority pauses not a moment on the provi-

---

[4] Section 4(f)(2) provides that it is not unlawful for an employer "to observe the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such . . . employee benefit plan shall require or permit the involuntary retirement of any individual . . . because of the age of such individual." 29 U. S. C. § 623(f)(2).

sion's purposes or legislative history. Only after burial, and almost by afterthought, does the majority attempt to come up with its own interpretation of the exemption, hastily proceeding to divine the capacious alternative reading outlined earlier.

There are deep problems with the majority's interpretive methodology, chief among them its unwillingness to apply the same unforgiving textual analysis to its reading of the §4(f)(2) exemption as it does to the consensus reading, and its selective use of legislative history to suggest that Congress contemplated the draconian interpretation of §4(f)(2) the majority divines. A conventional analysis of §4(f)(2) illuminates these methodological lapses, and yields a very different result.

Beginning with the text, the only thing plain about §4(f) (2)'s spare language is that it offers no explicit command as to what heuristic test those applying it should use. In dispatching the consensus reading, the majority makes much of the fact that "[t]he requirement that employers show a cost-based justification for age-related reductions in benefits appears nowhere in the statute itself." *Ante*, at 170. This truism, is, however, equally applicable to the complex construction the majority adopts, under which all but certain limited species of benefit plan discrimination are exempted from the ADEA, and under which the burden of proving non-exemption is shouldered by the ADEA plaintiff.[5] Indeed,

---

[5] The majority's holding that the employee bears the heavy burden of proving not only that a discriminatory benefit plan implicates nonbenefit aspects of employment, but also that it was intended to discriminate, strikes a further blow against the statutory rights of older workers. *Ante*, at 182. It is one thing for an employee to prove discrimination against older workers. It is considerably more difficult to prove that an employer undertook such discrimination with unlawful motives. In light of the severe evidentiary and practical obstacles, where discrimination in non-fringe-benefit aspects of the employment relationship has been proved, a more appropriate approach would place the burden on the employer to show that the discrimination was not born of improper intent. See *Wards*

the fact that § 4(f)(2) enumerates various types of benefit programs eligible for exemption from the ADEA's nondiscrimination command but makes no mention of disability programs strongly undercuts the majority's assertion that the text compels exemption here. This is a case in which only so much blood can be squeezed from the textual stone, and in which one therefore must turn to other sources of statutory meaning.

The structure of § 4(f)(2), on the other hand, provides considerable support for the business purpose interpretation. The majority views § 4(f)(2) as involving two separate clauses, with the first enumerating, for no apparent reason, three types of benefit plans, and the second, the "subterfuge" clause, making § 4(f)(2)'s exemption applicable except where a benefit plan is created with a "specific 'intent . . . to evade'" the ADEA. *Ante*, at 171 (citation omitted). This reading has the perverse consequence of denying the § 4(f)(2) exemption only to subtle acts of discrimination effected through a stratagem or other artifice of discrimination, while leaving it intact for those age-based distinctions like PERS which, though arbitrary, are *so* brazenly discriminatory in disentitling older workers to benefits that they cannot possibly warrant the "subterfuge" characterization. It is difficult to believe that Congress, in passing the ADEA, intended to immunize acts of unabashed discrimination against older workers.

A far more sensible structural interpretation regards the § 4(f)(2) sentence as a synthetic whole. Under this reading, the initial enumeration of "a retirement, pension, or insurance plan" serves a concrete purpose: it gives content to the ensuing word "subterfuge." All the enumerated benefit plans commonly—indeed, almost invariably—entail costs that rise with the age of the beneficiary; thus, an employer whose benefit plan treats older workers less favorably than

*Cove Packing Co.* v. *Atonio*, 490 U. S. 642, 668 (1989) (STEVENS, J., dissenting).

younger ones though spending the same amount on each employee, typically has a cost-based reason for doing so. By this reading, an employer with an economic justification cannot properly be viewed as having resorted to subterfuge to evade the ADEA's command against irrelevant age distinctions. Unlike the majority's artificial bifurcation of § 4(f)(2), this holistic interpretation does not excuse express acts of unjustified age discrimination like PERS', while punishing only evasive or subtle discrimination. Significantly, all the Courts of Appeals to consider § 4(f)(2) have concluded that the enumeration of benefit plans where age and cost generally correlate sheds considerable light on the scope of the exemption.[6] And once the possibility of this interpretation is admitted, the majority's sole ground for rejecting the business purpose interpretation—that it clashes with the "plain language of the statute," *ante*, at 171—necessarily falls away.

The majority's reliance on the text of the statute as a basis for rejecting the business purpose test is, finally, made puzzling in light of its concession that its "construction of the words of the statute is not the only plausible one." *Ante*, at 177. It is difficult to avoid the conclusion that the majority is using two different standards of textual analysis: the business purpose interpretation fails because the plain language

---

[6] See *Betts* v. *Hamilton County Bd. of Mental Retardation and Developmental Disabilities*, 848 F. 2d 692 (CA6 1988) (case below); *EEOC* v. *Mt. Lebanon*, 842 F. 2d 1480 (CA3 1988); *Karlen* v. *City Colleges of Chicago*, 837 F. 2d 314 (CA7 1988); *Cipriano* v. *Board of Ed. of North Tonawanda School Dist.*, 785 F. 2d 51 (CA2 1986); *EEOC* v. *Westinghouse Elec. Corp.*, 725 F. 2d 211 (CA3 1983), cert. denied, 469 U. S. 820 (1984); *EEOC* v. *Borden's, Inc.*, 724 F. 2d 1390 (CA9 1984). It is true that these courts took slightly divergent analytic paths to this common result: some have interpreted § 4(f)(2) *ab initio* and others have deferred to the EEOC's statutory reading to this effect; some have imputed the business purpose requirement to the term "subterfuge" and others have instead attributed it to § 4(f)(2) more generally. This divergence, however, in no way vitiates the significance of the Courts of Appeals' unanimity that the statute supports the business purpose requirement.

of the statute does not command it, but the majority's interpretation succeeds because the plain language of the statute does not preclude it.

Given, then, that some ambiguity remains under any fair reading of § 4(f)(2)'s text and structure, it therefore is appropriate to consult its legislative history. This history convincingly supports the holistic reading and the business purpose interpretation derived therefrom. As initially introduced by Senator Ralph Yarborough in 1967, § 4(f)(2) did not recognize any circumstances that might authorize age discrimination in the provision of fringe benefits. Instead, it sheltered only the employer who "separate[s] involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act." S. 830, 90th Cong., 1st Sess. (1967).[7]

Several Senators, however, led by Senator Jacob Javits, urged that employers, in fashioning benefit programs, be allowed to consider cost differentials between benefits provided to older employees and those provided to younger ones. During Senate hearings on the bill which became the ADEA, Senator Javits criticized the initial version of § 4(f)(2), stating that that version did "not provide any flexibility in the amount of pension benefits payable to older workers depending on their age when hired." Age Discrimination in Employment: Hearings on S. 830 and S. 788 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess., 27 (1967). Employers "faced with the necessity of paying greatly increased premiums," Senator Javits feared, might "look for excuses not

---

[7] The narrow scope of this initial exemption may have reflected the fact that Congress was aware that employers at that time did not regard as a major concern the benefit-program costs associated with older workers. See, e. g., Report of the Secretary of Labor to the Congress Under Section 715 of the Civil Rights Act of 1964, The Older American Worker: Age Discrimination in Employment 16 (1965) ("Relatively few employers . . . cited the costs of providing pension and insurance benefits as significant barriers to employment of older persons").

to hire older workers." *Ibid.* Senator George Smathers, a cosponsor of the initial bill, acknowledged in response that the bill would not permit employers to vary benefit levels to take into account the greater expense of providing some fringe benefits to older workers. *Id.*, at 29–30. He proposed amending it to permit such variations. The following day, Senator Javits proposed, as a means of incorporating his and Senator Smathers' concerns, an amendment which incorporated essentially the present language enumerating specific types of benefit plans. 113 Cong. Rec. 7077 (1967). The Javits proposal, which was ultimately adopted and which underwent only peripheral changes before the Act's enactment, was designed to ensure, in its sponsor's words, that "an employer will not be compelled to afford older workers exactly the same pension, retirement, or insurance benefits as younger workers and thus employers will not, *because of the often extremely high cost of providing certain types of benefits to older workers,* actually be discouraged from hiring older workers." 113 Cong. Rec. 31254–31255 (1967) (emphasis added).

The history of § 4(f)(2) militates in favor of the business purpose interpretation in several respects. First, it demonstrates that the sponsors of the exemption intended to protect benefit plans with economic justifications for treating older workers disparately, and did not intend categorically to immunize benefit plans from liability for unjustified discrimination. See *FEA* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 564 (1976) (statements of sponsors "deserv[e] to be accorded substantial weight in interpreting the statute").[8]

---

[8] The majority attempts to appropriate Senator Javits by stringing together fragments of his comments on the Senate floor. The majority cites his statement that "'the age discrimination law is not the proper place to fight' the battle of ensuring 'adequate pension benefits for older workers.'" *Ante,* at 179, quoting 113 Cong. Rec. 7076 (1967). But as the EEOC notes, this remark, read in proper context, does not suggest that "*any* type of discrimination in the provision of employee benefits should be permissible under the ADEA," but makes the more limited point that

Second, this history undercuts the majority's contention that the § 4(f)(2) term "subterfuge to evade the purposes of the Act" supports the broad exemption of benefit plans from coverage. That phrase *predated* the Javits amendment, and was part of the bill when it did not authorize any age-based discrimination in the provision of benefits. The language broadening the exemption must come instead from the enumeration language added at Senator Javits' behest, language most properly read to import only the business purpose test. Third, at no point during the debate on § 4(f)(2) did any legislator come even remotely close to endorsing the construction of § 4(f)(2) chosen by the majority. This silence is hardly surprising, given that an unqualified exemption contravenes Congress' overarching goal in passing the ADEA of protecting older workers against arbitrary discrimination. The business purpose test, on the other hand, advances this goal, playing the hardly radical role of ensuring that, where *no* justification exists for disparate age-based treatment, older workers are not saddled with burdens that should be shared by all workers or by their employer.[9]

---

certain existing pension plans with lengthy vesting periods "should be changed by comprehensive pension legislation rather than by an age discrimination statute." Brief for EEOC as *Amicus Curiae* 17, n. 9 (emphasis added). Senator Javits eventually proposed, and won the enactment of, such legislation. See 29 U. S. C. § 1053 (1982 ed. and Supp. V). Similarly, Senator Javits' statement that amended § 4(f)(2) provides "'a fairly broad exemption . . . for bona fide retirement and seniority systems,'" *ante*, at 179, quoting 113 Cong. Rec. 7076 (1967), fully accords with the business purpose test. That test exempts from § 4(f)(2)'s coverage any act of age discrimination with some legitimate business basis—leaving unprotected only the presumably narrow band of benefit programs, like PERS, which practice unjustified age discrimination.

[9] That Congress viewed the § 4(f)(2) exemption as bounded by a business purpose requirement was, if anything, confirmed in 1978, when Congress added a clause in response to *United Air Lines, Inc.* v. *McMann*, 434 U. S. 192 (1977). In rejecting a claim that a plan adopted before the ADEA's enactment could be a subterfuge, *McMann* declined to hold that a "*per se* rule requir[ed] an employer to show an economic or business pur-

Even if I did not strongly believe that the text and structure of the § 4(f)(2) exemption, as informed by its legislative history, limit the exemption to benefit plans whose discrimination against older workers rests on some business justification, I would still conclude that adoption of the business purpose test is mandated under *Chevron*'s admonishment to defer to enforcement agencies' reasonable interpretations of ambiguous statutory provisions. See *Western Air Lines, Inc.* v. *Criswell,* 472 U. S. 400, 412 (1985) (deferring to Department of Labor and EEOC on interpretation of ADEA). Shortly after the ADEA's passage, the Department of Labor, which originally administered the Act, interpreted § 4(f)(2) to allow employers to discriminate on the basis of age in the provision of employee benefits, but only where providing such benefits was more expensive for older workers. See 29 CFR § 860.120(a) (1970). Where cost did not vary with age, the Department of Labor concluded, § 4(f)(2) did not exempt from ADEA scrutiny discriminatory benefit programs. See § 860.120(b) ("Not all employee benefit plans, but only those similar to the kind enumerated in section 4(f)(2) of the Act come within this provision," and thus profit-sharing and other plans lacking an economic basis for discriminating against older workers were not exempted by § 4(f)(2)); 34 Fed. Reg.

---

pose in order to satisfy the subterfuge language of the Act." 434 U. S., at 203. This statement, referring only to pre-ADEA plans, left open the issue of a *per se* business purpose rule for discriminatory plan provisions adopted after the Act's passage. Reiterating the need for an economic justification for discrimination, Senator Javits stated during the 1978 debate: "The meaning of the exception, as I stated in [the 1967] colloquy with Senator Yarborough on the Senate floor, was that an 'employer will not be compelled under this section to afford to older workers exactly the same pension, retirement, or insurance benefits as he affords to younger workers.'" 124 Cong. Rec. 8218 (1978). The Senator explained that "[w]elfare benefit levels for older workers may be reduced only to the extent necessary to achieve approximate equivalency in contributions for older and younger workers." *Ibid.*

9709 (1969) (same).[10] The EEOC, to which responsibility for enforcing the ADEA was transferred in 1979, adopted *in toto* Labor's business purpose interpretation of § 4(f)(2). The EEOC's regulations state that § 4(f)(2)'s purpose "is to permit age-based reductions in employee benefit plans *where such reductions are justified by significant cost considerations.*" 29 CFR § 1625.10(a)(1) (1988) (emphasis added).[11] The majority's derogation of this dual agency interpretation leaves one to wonder why, when important civil rights laws are at issue, the Court fails to adhere with consistency to its so often espoused policy of deferring to expert agency judgment on ambiguous statutory questions. See, *e. g., General Electric*

[10] The majority's dismissal of this administrative interpretation of § 4(f)(2) on the ground that it was not contemporaneously issued is disingenuous. In the majority's view, the Department of Labor initially articulated a broad "safe harbor" exemption for benefit programs, and only in 1979 revised its interpretation to adopt the business purpose test. *Ante,* at 171–172. The sole support the majority adduces for this proposition is the Department of Labor's 1969 regulation providing that age-related benefit reductions would be "'considered in compliance with the statute'" if cost justified. *Ante,* at 171, quoting 29 CFR § 860.120(a) (1970). This regulation does not demonstrate that Labor was applying a business purpose test, the majority suggests, apparently because the regulation failed explicitly to state the corollary proposition that non-cost-justified plans fall outside the statutory exemption. This tenuous reading fails to explain (1) why Labor saw a need to include the cost-justification qualification in its reading of the exemption; (2) why Labor stated that profit-sharing plans, lacking an economic basis for age discriminating, fall outside the exemption; and (3) why Labor, in its 1979 pronouncement, in no way suggested it was changing its construction of § 4(f)(2).

[11] See also 29 CFR § 1625.10(a)(1) (1988) ("A benefit plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits or insurance coverage"); § 1625.10(d) ("[A] plan or plan provision which prescribes lower benefits for older employees on account of age is not a 'subterfuge' within the meaning of section 4(f)(2), provided that the lower level of benefits is justified by age-related cost considerations").

*Co.* v. *Gilbert,* 429 U. S. 125, 155–156 (1976) (BRENNAN, J., dissenting).

The majority today puts aside conventional tools of statutory construction and, relying instead on artifice and invention, arrives at a draconian interpretation of the ADEA which Congress most assuredly did not contemplate, let alone share, in 1967, in 1978, or now. Because I cannot accept that it is the ADEA's command to give employers a free hand to fashion discriminatory benefit programs, I dissent.