**Gerald T. WESTHOVEN, Personal Representative of the Estate of Kenneth Westhoven, deceased, and State of Indiana Civil Rights Commission, Appellants–Defendants,**

v.

**LINCOLN FOODSERVICE PRODUCTS, INC., Appellee–Plaintiff.**

No. 35A02–9206–CV–260.

Court of Appeals of Indiana, Second District.

July 6, 1993.

Richard J. Swanson, Segal and Macey Indianapolis, Evan Wolfson, Lambda Legal Defense and Educ. Fund, Inc., New York City, Kevin Likes, Auburn, for Gerald T. Westhoven.

1. 29 U.S.C. §§ 1001–1461 (1988).

2. I.C. 22–9–1–1 *et seq*. (Burns Code Ed.1992 & Supp.1992).

Pamela Carter, Atty. Gen., Janice E. Kreuscher, Chief Counsel, Office of Atty. Gen., Indianapolis, for State of Ind., Civil Rights Com'n.

Thomas M. Kimbrough, David R. Steiner, Barrett & McNagny, Fort Wayne, for Lincoln Foodservice Products, Inc.

SULLIVAN, Judge.

Gerald T. Westhoven, in his capacity as personal representative of the Estate of Kenneth Westhoven, and the Indiana Civil Rights Commission (Commission), collectively referred to as Westhoven, appeal the trial court's grant of summary judgment in favor of Lincoln Foodservice Products, Inc. (Lincoln). The dispositive issue upon appeal is whether the Employee Retirement Income Security Act of 1974 (ERISA)[1] preempts Indiana Civil Rights Law (ICRL)[2] thereby depriving the Indiana Civil Rights Commission of jurisdiction to regulate Lincoln's self-funded group health insurance plan.

We affirm.

Lincoln manufactures steel food service equipment and commercial aluminum utensils in Fort Wayne, Indiana. The facility employs more than three hundred workers. In 1982, Lincoln hired Kenneth Westhoven, an industrial engineer, to perform time-study management and work-rating studies. Kenneth remained in this salaried position until he became totally disabled in July, 1989.

In 1986, Kenneth tested positive for the HIV virus, the precursor to Acquired Immune Deficiency Syndrome (AIDS). In December, 1988, Kenneth learned he had contracted AIDS and subsequently informed Lincoln of this fact. As a result of his AIDS, Westhoven was a handicapped employee within the meaning of I.C. 22–9–1–3(i) and (q). Stipulation of Fact, ¶ 7.[3] Kenneth submitted medical benefits claims pursuant to Lincoln's self-funded group medi-

3. The parties entered into this stipulation solely for the purposes of the underlying action. Stipulation of Fact, ¶ 7.

cal insurance plan (Plan) which had been revised effective January 1, 1988.[4]

According to the terms of the Plan[5], a maximum lifetime benefit of $1,000,000 provided "major medical expense benefits" for covered individuals. However, individuals with AIDS and AIDS Related Complex (ARC) were limited to annual benefits of $25,000 and a maximum lifetime benefit of $50,000. Due to the reduced coverage for AIDS-related medical expenses, Lincoln denied Kenneth $19,750 in annual benefits. As of August, 1990, Kenneth had exhausted approximately sixty percent of his maximum lifetime benefit. Kenneth filed a complaint with the Commission charging that the significant disparity of medical benefits constituted unlawful discrimination on the basis of handicap. Lincoln denied the allegations of discrimination.

After a hearing upon the complaint, the hearing officer entered Proposed Findings of Fact, Conclusions of Law, and Order. The Commission adopted and incorporated the hearing officer's proposals and issued an order adjudging Lincoln to be in violation of Indiana's Civil Rights Law.

This case presents several interesting questions concerning the interplay of federal and state laws relating to employee benefit plans. Initially, we must determine whether the ICRL is exempt from pre-emption by the Employee Retirement Income Security Act of 1974 (ERISA).[6] We conclude it is not.

In determining whether express or implied pre-emption attains, we are mindful that our analysis must give effect to congressional intent and that our conclusion must comport with the legislative purposes of ERISA. *Shaw v. Delta Airlines, Inc.* (1983) 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490. Since its inception in 1974, ERISA has provided a comprehensive statutory scheme promoting "the interests of employees and their beneficiaries in employee benefit plans."[7] *Id.* at 90, 103 S.Ct. at 2896. In an effort to eliminate the threat of inconsistent and conflicting state laws in this field, ERISA imposed federal regulation upon employee welfare plans by establishing uniform reporting, disclosure, and fiduciary responsibility standards. *Id.* at 91, 103 S.Ct. at 2896. However, ERISA

4. A plan is "self-funded," sometimes termed "self-insured," when the employer, rather than an insurance company, assumes total financial responsibility and risk for providing plan benefits. *See* Eric C. Sohlgren, Note, *Group Health Benefits Discrimination Against AIDS Victims: Falling Through the Gaps of Federal Law– ERISA, The Rehabilitation Act of 1973, and The Americans With Disabilities Act*, 24 Loy. L.A.L.Rev. 1247, 1251, n. 10 (1991) [hereinafter Note, *Health Benefits*]. Self-funding employers often "purchase stop-loss insurance, where the employer self-insures its plan expenses up to a certain dollar level for each claim, or up to a specific level of aggregate expenses during the year, but then insures the balance of liabilities over this amount with an independent insurer." *Id.*

Commencing January 1, 1988, Lincoln's Plan utilized "stop-loss" insurance. Pursuant to the revised Plan, Lincoln's self-insurance paid certain medical benefits up to $50,000 per twelve-month period. Beyond that annual dollar amount, Lincoln had "reinsured liability" provided through Commonwealth of Kentucky Insurance Company.

5. The Plan is comprised of a two-tiered benefits system. Level 1, the base plan, lists certain specific medical expenses and the amount of coverage provided for each covered expense

with the exception of AIDS, AIDS Related Complex (ARC), Mental Illness, Alcoholism, Drug Abuse, Nervous Disorders, and Psychiatric and Psychoanalytic treatment (the "catastrophic" or "high risk illnesses"). No expenses for the enumerated catastrophic conditions are covered under Level 1.

Level 2, the major medical plan, covers all expenses not in Level 1. Individuals submitting claims for Level 2 conditions, with the exception of the catastrophic conditions, must pay 20% of the first $2,000 of covered expenses and thereafter the balance of covered expenses are paid completely by the Plan. Catastrophic expenses are covered, under Level 2, up to 80% for hospital inpatient charges and 50% for outpatient charges *subject to* the yearly and lifetime maximums ("caps"). The lifetime cap for "catastrophic" conditions other than AIDS and ARC is $25,000.

6. Westhoven and Lincoln agree that the Plan is an "employee benefit plan" as defined in ERISA.

7. An "employee benefit plan" includes both pension plans and welfare plans, e.g., group medical benefits. 29 U.S.C. § 1002(3). We consider only employee welfare plans which include any program that provides benefits for contingencies such as illness, accident, disability, death, or unemployment. 29 U.S.C. § 1002(1).

neither mandates that employers provide particular benefits nor specifically proscribes discrimination in the provision of employee benefits.[8]

## I. *ERISA Pre-emption*

ERISA's regulatory reach is underscored by a broad pre-emption clause. Section 514(a) of ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan".. 29 U.S.C. § 1144(a). "A law 'relates to' an employee benefit plan ... if it has a connection with or reference to such a plan." *Shaw, supra* at 96–97, 103 S.Ct. at 2900 (state law requiring employer to provide pregnancy benefits relates to employee benefit plan). *Cf. Edwards v. Bethlehem Steel Corp.* (1990) 4th Dist. Ind. App., 554 N.E.2d 833, *trans. denied* (application of state mechanics lien statute to enforce conditions of fringe benefits relates to employee benefit plan).

■ In the instant case, the ICRL prohibits Lincoln from structuring its Plan in a manner which discriminates against employees on the basis of handicap. I.C. 22–9–1–2. Lincoln and Westhoven concede that the ICRL is connected with or is construed in reference to the Plan. Nevertheless, the fact that the ICRL "relates to" an employee benefit plan does not automatically trigger pre-emption because the scope of pre-emption is not absolute. ERISA permits certain independent, albeit potentially inconsistent or contradictory, state action in specified areas of local interest and concern.

For example, the "savings" clause explicitly saves state insurance, banking, and securities laws from pre-emption. 29 U.S.C. § 1144(b)(2)(A). Under the "deemer" clause, self-funded plans are not considered "an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." *Id.* at § 1144(b)(2)(B).[9] This does not end the inquiry, however, because all welfare benefit plans, whether self-funded or otherwise, remain subject to all *federal* laws whose reach is coterminous with ERISA.

■ Further, section 514(d) provides that "[n]othing in this subchapter shall be con-

---

**8.** 29 U.S.C. § 1051(1) (Section 201). Although *pension* benefits, subject to ERISA vesting requirements, may create legally enforceable rights, group health insurance benefits are not similarly protected. Recently, courts have held that amending the terms of an employee benefit plan by placing caps on AIDS benefits did not constitute illegal discrimination of benefits under ERISA. *McGann v. H & H Music Company* (1991) 5th Cir., 946 F.2d 401, *cert. denied,* (1992) — U.S. —, 113 S.Ct. 482, 121 L.Ed.2d 387; *Owens v. Storehouse, Inc.* (1991) N.D.Ga., 773 F.Supp. 416, *aff'd.,* (1993) 984 F.2d 394.

These case are distinguishable upon one critical point. The actions, in both cases, were grounded solely upon § 510 of ERISA. The issues of whether state employment antidiscrimination laws prohibited the employer's practices or whether ERISA pre-emption would preclude consideration of a state law claim were not addressed in *McGann* or *Owens.* Interestingly, in the Brief for the United States as Amicus Curiae filed in support of a motion to deny certiorari in *McGann,* the U.S. Solicitor General suggested that alleged discrimination under the terms of employee benefit plans would likely be tested under the Americans With Disabilities Act of 1990 (ADA). Recently, the New York District Office of the Equal Employment Opportunity Commission issued a determination that the conduct of Respondent–Trust Fund, who changed its health insurance plan on July 1, 1991, by explicitly excluding payment for expenses arising from AIDS and ARC, facially violated the ADA. *Terrence Donaghey, Jr. v. Mason Tenders District Council Trust Fund,* Charge No. 160–93–0419 (January 28, 1993), *reprinted in* 25 Daily Lab.Rep. D–1 Full Text Section (February 9, 1993).

**9.** The purpose of the "deemer" clause is to prevent "back-door attempts by states to regulate core ERISA concerns in the guise of *insurance regulation.*" *FCM Corp. v. Holliday* (1990) 498 U.S. 52, 111 S.Ct. 403, 406, 112 L.Ed.2d 356 (emphasis supplied). Thus, Lincoln's self-funded plan would not be subject to Indiana's *insurance* laws that regulate employee welfare plans. Whereas the holding of *FCM Corp.* would control had Westhoven sought relief under insurance rules or regulations, it is inapposite for a determination as to the issues framed in the instant case. Here, the net effect of the clauses clarifying pre-emption is to place Lincoln's plan squarely within the regulatory confines of ERISA insofar as the "savings" and "deemer" clauses are concerned.

strued to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law." *Id.* at § 1144(d). In certain circumstances, ERISA coexists with federal laws promulgated in areas that may, in fact, relate to and impact upon employee benefit plans. In addition, enactment of state laws specifically authorized by federal law are not deemed pre-empted. *Cf. Shaw, supra.* *Shaw* discusses the ERISA pre-emption doctrine within the context of federal civil rights laws. In *Shaw*, a provision of New York's Human Rights Law requiring employers to pay sick leave benefits to employees disabled because of pregnancy was pre-empted by ERISA because the Supreme Court had previously determined that Title VII did not substantively mandate pregnancy benefits. The Court held that the state law was pre-empted with respect to ERISA "only insofar as [the state law] prohibits practices that are lawful under federal law." *Shaw, supra,* 463 U.S. at 108, 103 S.Ct. at 2906.[10] Conversely, the Court held that beyond the provisions of the state law that prohibited lawful federal practices, the New York Human Rights Law would not be pre-empted. *Id.* We express no opinion, however, beyond the state laws specifically discussed in this opinion, as to what other provisions of a state law may or may not survive pre-emption.

The issue, here, is whether the allegedly discriminatory practices prohibited by the ICRL are lawful under federal law. Restated, the critical inquiry is whether federal law proscribes discrimination on the basis of handicap in the provision of employee welfare plans. If no proscription exists, ERISA pre-empts consideration of Westhoven's state law claim.

Westhoven and Lincoln acknowledge that ERISA pre-empts the ICRL to the extent that the ICRL relates to Lincoln's employee benefit plan. Westhoven contends, however, that the Rehabilitation Act of 1973[11] (Rehabilitation Act) and the Americans with Disabilities Act of 1990[12] (ADA) displace pre-emption pursuant to Section 514(d) of ERISA. According to Westhoven, ERISA pre-emption of the ICRL would, in derogation of *Shaw*, impair the enforcement of federal antidiscrimination laws which protect the handicapped. Lincoln counters that the Rehabilitation Act did not at times here relevant apply to Lincoln and that the ADA has no bearing upon the resolution of alleged discriminatory practices which took place prior to its enactment. In order to succeed, Westhoven must demonstrate that federal law prohibits an employer from reducing and, ultimately, capping medical benefits solely upon the basis of handicap and that pre-emption of the ICRL would impair such federal law.

## II. *The Rehabilitation Act of 1973*

The Rehabilitation Act, which is enforced by the Office of Federal Contract Compliance Programs, prohibits federal contractors (with government contracts exceeding $2,500 annually) or individuals receiving federal funding from discriminating against handicapped individuals. 29 U.S.C. §§ 793, 794 (1988). Federal rules impose an affirmative duty to "treat qualified handicapped individuals without discrimination" in all employment practices, including "rates of pay or other forms of compensation," such as employee welfare benefits. 41 C.F.R. § 60–741.4(a) (1990). Be that as it may, the Rehabilitation Act does not provide the refuge from pre-emption which Westhoven seeks.

The Rehabilitation Act did not apply to Lincoln. By all accounts, Lincoln was neither a federal contractor nor a recipient of federal funds. To expend time and effort, as did the Commission, hypothesizing the outcome *if* Lincoln was subject to the Rehabilitation Act is beyond pointless speculation.[13] The task of the Commission is to

---

**10.** In 1978, Congress amended Title VII to specifically forbid pregnancy discrimination. 42 U.S.C. § 2000e (1988).

**11.** 29 U.S.C. § 701 *et seq.* (1988).

**12.** 42 U.S.C. § 12101 *et seq.* (Supp.1992) (effective July 26, 1992).

**13.** Here, the Commission's analytical foray into irrelevant factual and legal matters not only obscures review but, in effect, enervates the

provide findings of *pertinent* facts which promote the intelligent review of its decisions. *Pettit v. Indiana Alcoholic Beverage Commission* (1987) 1st Dist. Ind.App., 511 N.E.2d 312.

■ Further, we need not ponder whether the Rehabilitation Act created a regulatory void vis a vis private contractors. Simply put, no void exists. The Rehabilitation Act does not prohibit private contractors from discriminating on the basis of handicap. *Cf. Shaw, supra,* 463 U.S. at 104, 103 S.Ct. at 2903 (concluding that "Title VII is neutral on the subject of all employment practices it does not prohibit. We fail to see how federal law would be impaired by pre-emption of a state law prohibiting conduct that federal law permitted.") At the time of the alleged discrimination in the instant case, Lincoln's conduct was permitted under federal law.

Undoubtedly, the ICRL mirrored the Rehabilitation Act by extending antidiscriminatory mandates to private contractors. But even if we were to accept the underlying assumption that Indiana drafted its laws to conform to the Rehabilitation Act, that fact, standing alone, does not trigger § 514(d) exemption from ERISA pre-emption. In *Shaw,* the Supreme Court recognized that states may accord broader protections than those provided under Title VII *and* that Title VII expressly preserved nonconflicting state laws. However, the Court specifically rejected the proposition that Title VII *transformed* nonconflicting state laws into federal law. *Shaw, supra* at 102, 103 S.Ct. at 2902. The Supreme Court determined that ERISA pre-emption of state law would impair Title VII only to the extent that the state law provided a

means of enforcing Title VII's commands. *Id.*

■ We must conclude, in accordance with the *Shaw* rationale, that insofar as the ICRL prohibits discriminatory conduct that is lawful under the Rehabilitation Act, ERISA pre-emption would not impair enforcement of the Rehabilitation Act within the meaning of § 514(d). Despite the conciliatory spirit of the ICRL, the Rehabilitation Act neither depends upon Indiana law for enforcement *nor* requires that Indiana extend the reach of federal law beyond federal contractors or recipients of federal funds. The Rehabilitation Act does not provide the required nexus between federal and state law so as to avoid pre-emption under § 514(d) of ERISA.

### III. *The Americans with Disabilities Act of 1990*

Westhoven points to the recent enactment of the ADA in support of the theory that the ICRL outlaws the same type handicap discrimination prohibited by federal law. In essence, the argument suggests that the provisions of the ICRL should be given effect because the ICRL correctly anticipated federal momentum in the direction of increased protections for the disabled. The import of the ADA, Westhoven believes, is its affirmation of a federal nondiscrimination policy. Clearly, the ADA places a congressional imprimatur upon the prohibition of discriminatory employment practices in the *private* sector.

Through legislative initiative, Congress indirectly addressed the absence of a specific antidiscrimination provision in

---

Commission's ultimate findings and conclusions. Moreover, the Commission's finding that "[w]ere the Plan benefits provided under a group insurance contract with a third party carrier ...," Findings of Fact, Conclusions of Law, ·and Order, ¶ 2 (Record at 566), absent substantiating facts, appears arbitrary and capricious. At best, it is a misguided attempt to editorialize upon matters clearly beyond the scope of the Commission's authority.

Presumably, the Commission's ire is directed towards perceived evasive tactics designed to circumvent antidiscrimination laws. For exam-

ple, a company may convert to self-funding to avoid state insurance regulations which do not allow insurance companies to exclude or restrict AIDS-related benefits. Note, *Health Benefits, supra* at 1250, n. 7. Approximately twenty states, including Indiana, have indicated that exclusions or severe limitations upon health insurance coverage for AIDS will not be allowed. *Id.* Be that as it may, the proper manner in which to challenge the impropriety of such practices—which may well be demonstrable—is through legislative initiative rather than judicial action.

ERISA.[14] The ADA prohibits discrimination against disabled individuals with respect to compensation and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a) (Supp.1992). The term "discriminate" encompasses, *inter alia*, participation in a contractual or other arrangement or relationship, including a relationship with an organization providing fringe benefits to an employee of an entity covered by the ADA, that effectively subjects the entity's disabled employee to the discrimination prohibited by the ADA. *Id.* at § 12112(b). Interestingly, the ADA *explicitly* construes the interplay of its provisions with federal or state antidiscrimination laws and with state laws affecting insurance plans. 42 U.S.C. § 12201(c) (Supp.1992).[15]

■ Pursuant to the ADA, and Indiana's companion legislation,[16] Lincoln is *presently* prohibited from discriminating upon the basis of handicap, i.e., against a "qualified individual with a disability," in a wide range of employment practices. At the time of the alleged discrimination, however, Lincoln was not bound by the ADA. This is true notwithstanding the fact that the ICRL pre-dated parallel provisions of federal law which now control.[17] The 1988 limitations Lincoln placed upon medical expenses related to AIDS and ARC were not subject to any federal law governing the provision or administration of employee benefit plans.

■ We conclude that ERISA pre-empts Indiana's civil rights laws. Consequently, the Commission was without jurisdiction to proceed upon Westhoven's complaint alleging discrimination in the terms, conditions, and privileges of employment. The trial

---

**14.** In *Shaw,* the Court recounted floor debates during which Senator Mondale questioned whether the Senate bill should be amended to require nondiscrimination in ERISA plans. In response, Senator Williams stated that, pursuant to Title VII, the Equal Employment Opportunity Commission (EEOC) could maintain and enforce nondiscrimination in employment. Consequently, ERISA did not contain a *per se* antidiscrimination clause, but relied upon existing federal law for assurances that ERISA plans would be administered in a nondiscriminatory fashion. *Shaw, supra,* at 104–05, 103 S.Ct. at 2903–04.

Theoretically, a separate antidiscrimination provision in ERISA would have been duplicative considering the then-existing federal and state laws. In practice, however, attempts to enforce nondiscrimination in employee benefit plans have been thwarted by a legalistic game of "hide the ball." Arguably, in light of the passage of the ADA, and possibly contrary to the analysis in *Shaw,* existing federal and state laws were *inadequate* to prevent discrimination against the working disabled, including the administration of ERISA benefits. Thus, the ADA completes the panoply of federal civil rights law by specifically identifying the rights and remedies available to disabled individuals working in the private sector.

**15.** Section 12201(c) does not displace current underwriting practices or the regulatory structure of the insurance industry. Rather, it reinforces the mandate that *any* State law ensuring the financial integrity, competent administration, and availability of benefit plans must be construed against an antidiscriminatory backdrop. Admittedly, the line between lawful underwriting, classification, and administration *and* unlawful discrimination may not be readily discernible. Nevertheless, shaping the contours of employee benefit plans to evade the general policies announced in the ADA is clearly unacceptable.

**16.** I.C. 22–9–5–1 *et seq.* (Burns Code Ed.1992 & Supp.1992). The "Employment Discrimination Against Disabled Persons" Act became effective for persons employing 25 or more individuals on July 26, 1992. The Act expressly provides that the Commission may not adopt rules that contradict parallel federal rules and regulations. I.C. 22–9–5–27. The Commission must give effect to the ADA's provisions including, but not limited to, 42 U.S.C. § 12201(c).

Thus, the Commission is incorrect in its assertion that "[a]n exception to the ban against permitting discrimination in the award of fringe benefits because of cost ... does *not* appear in the ICRA [ICRL]." Brief of Appellant at 25, n. 9 (emphasis in original). Although we express no opinion regarding the correct interpretation of § 12201(c), future consideration of the ICRL should be made in light of case law construing the same or similar provisions under federal law. *See, e.g., Public Employees Retirement System v. Betts* (1989) 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134, after remand, *cert. denied,* 498 U.S. 963, 111 S.Ct. 397, 112 L.Ed.2d 407 (addressing cost justifications for age-based distinctions under the Age Discrimination in Employment Act). Whether cost justifications exempt a bona fide benefit plan from the ADA or I.C. 22–9–5–1 is a question reserved for another day.

**17.** At oral argument, Westhoven conceded the ADA has no retroactive application to the facts of this case.

court properly entered summary judgment in favor of Lincoln Foodservice Products.

Judgment affirmed.

SHIELDS and FRIEDLANDER, JJ., concur.