

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0510-25

### THE STATE OF TEXAS

### v.

### GRADY JACK BARBER, Appellee

---

**ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW FROM THE NINTH COURT OF APPEALS LIBERTY COUNTY**

---

SCHENCK, P.J., filed a dissenting opinion in which RICHARDSON, J., joined and in which KEEL, J., joined as to Part II(B).

### DISSENTING OPINION

Seventy-three-year-old Bobby Guy Allen was killed in a motor vehicle collision between himself and Grady Jack Barber as Barber was exiting the parking

lot at the at Double B Oak Bar in Liberty County. A witness saw Barber consuming alcohol shortly before leaving in his vehicle.

The question here is whether evidence establishing Barber's intoxication can be introduced at his trial. The majority opinion avoids answering that question, though it throws a dark cloud over it in advance of a needless remand. Instead, it opines about ancillary questions concerning arrest powers. I disagree with its disposition in every respect and therefore dissent.

## I. BACKGROUND AND SUMMARY

A patron in the Double B Oak Bar in Liberty County called the Dayton Police Department to report that someone had been drinking and left in their vehicle. By the time Officer Eric L. Ibarra arrived to investigate the possible DWI resulting in Mr. Allen's death, Barber was being transported to Houston Methodist Baytown Hospital in Harris County, about thirty minutes away. Officer Ibarra quickly investigated and sought out Liberty County Magistrate Judge Thomas Chambers. Judge Chambers duly issued a warrant that is substantively unchallenged as supported by probable cause and gave the warrant to Officer Ibarra

who then delivered it to the hospital staff in Harris County.[1] The resulting blood draw—obtained at least some four hours and forty minutes after the collision—showed Barber's alcohol level at .079 BAC, meaning that he was likely heavily intoxicated when his car struck and killed Mr. Allen hours before.[2]

Following Barber's indictment for intoxication manslaughter, he moved to suppress the results of the blood draw on the theory that Officer Ibarra was essentially wearing the wrong-colored hat when he delivered the warrant to the hospital. That is to say, he contends that Officer Ibarra's authority to deliver Judge Chamber's warrant was prohibited by operation of a since abandoned subparagraph of Article 18.067 of the Texas Code of Criminal Procedure,[3] which, according to the argument, prohibited Officer Ibarra from delivering it unless he could also affect Barber's arrest. TEX. CODE CRIM. PROC. art. 18.067(2) (2024). The trial

---

[1] That Officer Ibarra was taken away from his law-enforcement duties for a significant period while driving back and forth between Liberty County and Harris County reflects a commitment to his task for which he should be commended.

[2] The collision was at about 7:20 p.m. on October 31, 2022. The search warrant was issued at 10:11 p.m. in Liberty County. The documentation does not show the precise time Barber's blood was drawn, but the phlebotomist's affidavit and warrant return reflect November 1, 2022.

[3] Act of May 15, 2025, 89th Leg., R.S., ch. 192, § 1, art. 18.067, 2025 Tex. Sess. Law Serv. 351, 351 (amending TEX. CODE CRIM. PROC. art. 18.067). This case is about a dead version of the statute. *Id.* The legislature has since removed the statutory provision. Consequently, the majority's opinion will have no prospective application.

court granted the request, and the State brought an interlocutory appeal under Article 44.01(a)(5) of the Code of Criminal Procedure. *Id.* art. 44.01(a)(5).

The Ninth Court of Appeals, in an exercise of common sense, reversed, signaling a prompt return of this case to the trial court for a resolution on the merits. *State v. Barber*, No. 09-24-00313-CR, 2025 WL 1749999, at *5 (Tex. App.—Beaumont June 25, 2025, pet. granted) (mem. op., not designated for publication). Unfortunately, it made the forgivable mistake of citing and relying in part on controlling authority of this Court in so doing. *Id.* at *4-5. That decision, *State v. Woodard*, 341 S.W.3d 404 (Tex. Crim. App. 2011), dealt with warrantless arrests and is implicated here only by reference to that power in a sentence of the blood-draw statute that, as noted, has since been abandoned. *See supra*, note 3. We granted review.

The majority now dissects that old decision as if we had granted a twenty-five-year-old rehearing in that case rather than the petition for discretionary review in this one. The majority does not attempt to answer the suppression question upon which interlocutory appellate jurisdiction is based. It instead remands that question for possibly months or years of further proceedings. *See* Maj. Op. at 28.

Put directly, there is no colorable basis for any decision that would exclude the proof of Barber's intoxication at the time of Mr. Allen's death, even if one

reads Article 18.067 to require *both* service of the warrant in an "adjacent county" *and* by a law enforcement official able to make an arrest in this case. I do not read the Article to so require. But regardless of its proper reading, our refusal to address that controlling legal question is unwarranted and disrespectful to the Ninth Court of Appeals, which adhered to both our precedent and, unlike this Court, its commitment to give the answer that the Code of Criminal Procedure, rules, and comity require. *See* TEX. CODE CRIM. PROC. art. 44.01(f); TEX. R. APP. P. 25.2(g) (proceedings in the trial court are suspended once the record has been filed in the appellate court until the lower court receives a mandate from the court of appeals), 40.2 (courts of appeals must hear and decide criminal appeals "at the earliest possible time"), 43.3 (appellate courts reversing a trial court's judgment must render the judgment the lower court should have rendered unless remand is ***necessary or in the interest of justice***). Our effort to redirect this case into a platform for opining on *Woodard*'s decision on arrest powers will be regarded as dicta unrelated to the resolution of this case, assuming this Court or the courts below eventually reach and properly resolve the suppression question that gives rise to it.

Worse, because our attack on *Woodard*'s construction of the arrest-power provisions is myopically targeted at two words—"presence" and "view"—

without regard to their amorphous object—every "offense" laid out in Article 14.01—this decision will serve to foment only confusion and disarray in the lower courts and among the law-enforcement community that is simultaneously told by our sister court that it has a "twenty-four hours a day," seven-day-a-week duty to make arrests across the State. *See* TEX. CODE CRIM PROC. art. 14.01; *Garza v. Harrison*, 574 S.W.3d 389, 402–03 (Tex. 2019) (citing TEX. CODE CRIM. PROC. arts. 6.06, 14.03(g)(2)). They will be left to wonder if their erroneous fidelity to the Supreme Court's command to act will subject them to suit or loss of immunity by virtue of our decision here. *See Garza*, 574 S.W.3d at 393–406. Similarly, state judges will wonder if our decision here reflects a lack of authority in themselves or the officers to whom they task with serving their warrants. *See* TEX. CODE CRIM. PROC. art. 18.06(a) ("A peace officer to whom a search warrant is delivered shall execute the warrant without delay . . . ."). Either presents a basic constitutional problem the majority's opinion ignores, though it looms over its (apparent) reading of Article 14.01.

As detailed below, I would begin and end this case by answering the question presented under the statute whose application authorized this appeal. That statute provides no basis for exclusion if either of two things are true: (1) the law said to be violated by the State is "unrelated to the purpose of the exclusionary rule" or

(2) where the evidence was "obtained by a law enforcement officer acting in objective good-faith reliance upon a warrant issued by a neutral magistrate based on probable cause." *Wilson v. State*, 311 S.W.3d 452, 459 (Tex. Crim. App. 2010) ("[A]rticle 38.23(a) may not be invoked for statutory violations unrelated to the purpose of the exclusionary rule."); TEX. CODE CRIM. PROC. art. 38.23(b) (good-faith exception for Texas exclusionary rule). In fact, both are true here.

Even if one accepts that Officer Ibarra or the Judge Chambers committed some error in delivering or authorizing the delivery of the warrant, respectively—and I do not—there is nothing in the statutory text, however it might be read, to call for exclusion of relevant evidence. *Wilson*, 311 S.W.3d at 459; *cf. Cort v. Ash*, 422 U.S. 66, 82–84 (1975) (legislation including prohibitions on government conduct does not inexorably support a private cause of action absent, among other things, proof of legislative intent). That the legislature has since unceremoniously jettisoned the linkage to arrest powers upon which the majority relies does little to suggest that it was ever intended to have the exclusionary mandate Barber now urges. The fact that the majority is forced to attack and undo our own authority in place at the time of Officer Ibarra's "execution" of the warrant would seem to conclusively resolve any argument about the good-faith limitation on exclusion under the plain language of our exclusion statute. *See* TEX. CODE CRIM. PROC. art.

38.23. That is, of course, unless we are now embracing the notion that law enforcement should regard all our opinions as presumptively incorrect. I like to think we aren't quite there yet.

## II. DISCUSSION

This case, as the majority concedes, is not about a warrantless arrest. Maj. Op. at 4. Officer Ibarra did not arrest Barber; he swiftly moved to present evidence (uncontested here) to Judge Chambers, who promptly issued a search warrant and directed Officer Ibarra to deliver it.[4] As postured by the majority's opinion, this case unavoidably poses the question whether Judge Chambers was within his *constitutional* authority to entrust Officer Ibarra with serving his warrant. *See* TEX. CONST. art. V, § 12(a) ("All judges of courts of this State, by virtue of their office, are conservators of the peace throughout the State."); *In re State ex rel. Wice*, 668 S.W.3d 662, 674 (Tex. Crim. App. 2023). This and other problems, large and small, loom over the majority's opinion.

---

[4] The majority does not discuss whether the error it perceives here stems from Officer Ibarra's taking and delivering of the warrant in Harris County or Judge Chambers in tasking him with doing so. Either, but especially the latter, poses constitutional concerns that should be avoided by either answering the Article 38.23 issue that gives rise to appellate jurisdiction or a fair reading of Article 18.067. *See* TEX. CODE CRIM. PROC. arts. 18.067, 38.23.

But, before we embark on attempting to answer any of these questions, I think we should first be focused on why this case is here and how we should be addressing it.

### A. The Issue Here is Whether Evidence of Barber's Drunkenness Should be Excluded.

Before I explain my disagreements with the majority over its reading of the various statutes involved here, I pause to pose the question of our stewardship of interlocutory appeals like this. Our appellate jurisdiction arises as an extension of statutorily authorized exception to the usual rule requiring a final judgment in the courts below. That jurisdiction arises in this case by virtue of a trial court order that "grants a motion to suppress evidence" and the "prosecuting attorney['s] certifi[cation] . . . that the appeal is *not taken for the purpose of delay* and that the evidence . . . is of *substantial importance in the case*." *See* TEX. CODE CRIM. PROC. art. 44.01(a)(5) (emphasis added).

That appeal is considered important enough to allow for the complete disruption of all proceedings in the trial court pending its resolution. *See id.* 44.01(e). The intermediate courts are directed that such appeals must be accelerated and given priority over the rest of their respective dockets. *See* TEX. R. APP. P. 28.1(a). I have no doubt that our lofty position affords us the power to

avoid the issues that give rise to these appeals in lieu of addressing ancillary or subsidiary arguments that do not ultimately provide an answer even though the majority finds them more interesting. Still, I believe we should be reluctant to dither or use cases such as this for the purpose of opining on collateral questions.

There is a subtle, but critical, distinction for appellate purposes between "issues" and "arguments" that relate to them. In the usual case *where the issue is not driving jurisdiction*, the difference speaks principally and only to whether it must be raised by the parties or presented in the intermediate appellate court below. An issue, other than subject-matter jurisdiction, must generally be raised by the parties and preserved by presentation to the courts below.[5] *See* Jeffrey M. Anderson, *The Principle of Party Presentation*, 70 BUFF. L. REV. 1029, 1045–46 (2022).

The various and sundry arguments that relate and drive the answer to the issue(s) are another matter. As Justice Scalia once famously observed: "Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research." *Carducci v. Regan*, 714 F.2d

---

[5] Owing to the critical nature of the criminal law matters within our exclusive jurisdiction, this Court is somewhat unique in being free to raise issues as it deems necessary. *See* TEX. CONST. art. V, § 4(b); TEX. R. APP. P. 66.1, 67. The authority should be carefully constrained to matters affecting the litigants' essential rights and the public confidence in the enforcement of its laws.

171, 177 (D.C. Cir. 1983).  Likewise, a party's failure to present an *argument* in the court of appeals should not constrain his or her ability to present it in connection with the effort to litigate *the issue* in a higher court.  *E.g.*, *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014) (distinguishing between "issues" and "arguments" for presentation and preservation purposes).

For all these reasons, I do not question our power to reach and address whatever arguments we find necessary or interesting in connection with the issue presented in any appeal to us.  But necessary and interesting are two different matters, particularly where the issue is driving our jurisdiction and our choice of arguments result in our not giving an answer to a necessary issue.  This is especially problematic in connection with an interlocutory appeal like this one, where we should be choosing our path that answers the issue quickly.[6]  We should strive to *avoid*, rather than *prefer*, reaching unnecessary and contentious sub-arguments that

---

[6] Judge Finley misunderstands the party presentation rule and its applicability to this Court.  In courts subject to its constraints, the rule requires the *parties* rather than the court to identify the "issue" to be decided.  A court's job in deciding that issue requires it to reach the *arguments* necessary to properly dispose of the case.  I thus cannot blame the decision here on the parties or the lower courts. Only this Court is responsible for avoiding the arguments that would resolve this case on an efficient and defendable basis, rather than neither.  Of course, that would be a problem here *even if* the party presentation rule applied to this Court.  But it does not.  This Court is not so constrained.  *See* TEX. CONST. art. V, § 5(b) ("[T]he Court of Criminal Appeals may, on its own motion, review a decision of a Court of Appeals in a criminal case as provided by law. Discretionary review by the Court of Criminal Appeals is not a matter of right, but of sound judicial discretion."); TEX. R. APP. P. 67 ("[T]he Court of Criminal Appeals may grant review of a court of appeals' decision in a criminal case at any time before the mandate of the court of appeals issues.").

will delay merits resolution. Viewed through that lens, judicial restraint is a virtue I find lacking in the majority's opinion here.

    i.       *Suppression is not proper as a matter of law under our precedents.*

As noted, the issue supporting this appeal is whether the evidence obtained through the hospital's blood draw should be suppressed. I do not find it difficult and would answer it directly.

The statute requires suppression where evidence is obtained "in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America . . . ." TEX. CODE CRIM. PROC. art. 38.23. To fit within that rule, however, the violation must be one that is both within the intended reach of Article 38.23(a) and outside of its good-faith exception. I believe both preclude suppression as a matter of law and without need of a remand.[7]

---

[7] The majority argues we should not address the good-faith issue because the SPA asks us only to remand the case. But neither the parties nor SPA have the responsibility to decide whether the good-faith exception should apply or whether, for example, Article 18.067 operates to supplant or erase the judge's constitutional statewide authority to have his warrants delivered by a willing law-enforcement officer. Those responsibilities are reserved for this Court. The majority seems to agree when it silently declares its reading of Article 18.067 fits within the scope of rules calling for exclusion under *Wilson*.

ii.    *Nothing in the old Article 18.067 signals an intention to preclude the results of a blood draw.*

Well before *Woodard*, we held that "the plain language of article 38.23(a) would suggest that evidence obtained in violation of *any* law must be suppressed" but that "article 38.23(a) may not be invoked for statutory violations unrelated to the purpose of the exclusionary rule." *Wilson v. State*, 311 S.W.3d 452, 459 (Tex. Crim. App. 2010) (emphasis in original); *see Roy v. State*, 608 S.W.2d 645, 651 (Tex. Crim. App. [Panel Op.] 1980); *Pannell v. State*, 666 S.W.2d 96, 97–98 (Tex. Crim. App. [Panel Op.] 1980). We further explained the purpose underlying the exclusionary rule is "to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement." *Wilson*, 341 S.W.3d at 458–59.

This Court approvingly discussed the issue as recently as two or three months ago. *See State v. Coleman*, Nos. PD-0093-25 & PD-0094-25, 2026 WL 237733, at *7 (Tex. Crim. App. Jan. 29, 2026). In *Coleman*, we said a defendant has Article 38.23 standing only if he has "suffered an infringement of a legal right." *Id.* (citing *Bluntson v. State*, No. AP-77,067, 2025 WL 1322702, at *36 (Tex. Crim. App. May 17, 2025)). It's not clear to me what legal "right" of Barber's was infringed or how it could support exclusion at trial.

Barber's blood was drawn pursuant to a valid warrant. So, *even if we reject my construction of the blood-draw statute* below, we are still not talking about an

unreasonable search that violated Barber's privacy rights—something Article 38.23(a) goes to—just the administrative procedure by which the valid warrant was "executed." I do not believe this procedural statute has the purpose of preventing the illegal procurement of evidence that allegedly happened in this case within the meaning of Article 38.23. On the contrary, the legislature said the statute is meant to facilitate the procedural execution of warrants in large cities and municipalities encompassing two or more counties.

None of this should be surprising. Legislatures and Congress frequently enact administrative requirements—often with directives that might operate to the benefit of litigants. But these precatory directives do not translate to a private right to enforce or pursue relief, absent some affirmative indication of that intention. *See Blessing v. Freestone*, 520 U.S. 329, 341 (1997). A party seeking relief in court, whether by civil remedy or, as here, prohibiting the State's use of otherwise admissible proof at his criminal trial "must assert the violation of a . . . *right*," not merely a violation of *law. Golden State Transit Corp. v. Los Angeles*, 493 U. S. 103, 106 (1989) (emphasis added).

When the Legislature enacts a law governing the relations between governmental actors or judges and private actors, as it did in the old Article 18.067, which confers different burdens for delivering warrants in adjacent counties, we

should not presume any intention to avoid a resolution of the resulting criminal trial on its merits on account of error.

> iii.  *Suppression cannot be supported on this record under the good-faith exception incorporated into Article 38.23.*

While I believe the good-faith question is embedded as a necessary precondition of any exclusion decision under the plain language of Article 38.23, I accept that it would ordinarily amount to a mixed question of law and fact.  But that is not true here because the good-faith exception conclusively applies.

The United States Supreme Court has explained the "benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion" because "[i]n most such cases, there is no police illegality and thus nothing to deter." *See United States v. Leon*, 468 U.S. 897, 920–21 (1984).  The same reasoning applies to the Texas good-faith exception embodied in Article 38.23(b). *State v. Brabson*, 966 S.W.2d 493, 497 (Tex. Crim. App. 1998) (citing *Leon* and Article 38.23 and stating "[t]he 'core' rationale of an exclusionary rule is to deter the police from illegally seizing evidence by making that evidence inadmissible at the defendant's criminal trial"); TEX. CODE CRIM. PROC. art. 38.23(b) ("It is an exception . . . that the evidence was obtained by a law enforcement officer acting in

objective good faith reliance upon a warrant issued by a neutral magistrate based on probable cause.").

That is precisely what happened here. There is nothing to deter. Officer Ibarra performed admirably, obtaining a search warrant and executing it in good faith at the direction of Judge Chambers, and because of what is essentially a procedural error, if it is error at all, *see infra*, the blood evidence could be suppressed despite being critical to this case.[8] The "error" as seen by the majority arises only by virtue of its rejection of controlling authority in place at the time the warrant was issued and executed. Neither Officer Ibarra nor Judge Chambers could (or should) have foreseen our rejection of *Woodard.*

Rather than acknowledging the unavoidable conclusion that the good-faith exception applies, the majority remands the case back to the court of appeals. I likely would agree with the majority if resolution of the issue was complex and ambiguous, but here the answer is easy, and remanding the case to the court of appeals to do what we could do right now (and which it almost certainly will do) will result only in (1) further delay in disposing of the case and (2) chaos being thrown into our application of the statute governing arrest power.

---

[8] This is especially true here where Officer Ibarra never personally observed Barber.

B.     *The Majority's Decision Misconstrues the Statute Giving Rise to the Suppression Claim.*

While the majority does not ultimately answer whether the blood evidence should be suppressed, its preference to address arrest powers and our *Woodard* decision's parsing of the words "presence" and "view" take it on a path that, by necessity starts with the text of Article 18.067, particularly its second, since-abandoned, subparagraph that contains the words implicating the arrest power of a law-enforcement officer.

That old Article reads:

*Notwithstanding any other law*, a warrant issued under Article 18.02(a)(10) to collect a blood specimen from a person suspected of committing an intoxication offense . . . , *may be executed*:

(1)  in any county adjacent to the county in which the warrant was issued; ***and***

(2) by any law enforcement officer authorized to make an arrest in the county of execution.

TEX. CODE CRIM. PROC. art. 18.067 (2024) (emphasis added); *see* Act of May 15, 2025, 89th Leg., R.S., ch. 192, § 1, art. 18.067, 2025 Tex. Sess. Law Serv. 351, 351 (removing (2) from Article 18.067).

The majority reads the statute either to limit the power of the issuing judge to authorize or the officer to serve the warrant in an adjacent county, or both.  I disagree.  The majority appears to ignore that the first section is an *authorization*,

"notwithstanding any other law,"[9] and that subparagraphs (1) and (2) are joined with "and," meaning either operates to authorize delivery of the warrant. The majority, however, treats them as separate, necessary preconditions to the existence of authority to serve a warrant. This is wrong in my view.[10] *E.g.*, *Pulsifer v. United States*, 601 U.S. 124, 127–28 (2024).[11]

---

[9] This reference to "any other law" indicates that this section was intended to clarify or confirm authority, such as that given to Judge Chambers directly in the Constitution, for example, to have his warrants served—statewide if necessary. *See infra.*

[10] Judge Finley maintains that legislative history of the 89th Legislature in 2025, prospectively and forever *rejecting* the result Judge Finley urges here, somehow confirms his conclusion that the 87th Legislature must have meant for blood-draw evidence to be excluded under Article 18.067 on account of who delivered it. But the legislative history came *after* and presumably in response to the district court's decision in this case and in connection with the passage of a bill that *eliminated* the theory of exclusion the district court and Judge Finley embraces. Acknowledging the reading *and* foreclosing it is not the endorsement Judge Finley urges and, at best, is irrelevant to what the of 87th legislature intended in 2024. *E.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) ("'[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'"); *Public Emp. Retirement Sys. v. Betts*, 492 U.S. 158 (1989) ("We have observed on more than one occasion that the interpretation given by one Congress (or a committee . . . thereof) to an earlier statute is of little assistance in discerning the meaning of that statute.").

[11] The majority allows its reading of Article 18.067 to trump the judge's apparent constitutional authority "throughout the state" and, instead, to preclude his empowering a willing law enforcement officer to deliver his warrant "throughout the state." Rather than preserving that authority in the first four words of Article 18.067 ("notwithstanding any other law"), the majority goes on to read its (further) *authorization* as a *prohibition*. Having treated the authorization as a prohibition, and the act of delivery as the "execution," the statute would now function as:

> ~~Notwithstanding any other law~~, a warrant issued under Article 18.02(a)(10) to collect a blood specimen from a person suspected of committing an intoxication offense . . . may *not* be executed *unless it is delivered*:

The two subparagraphs of Article 18.067 relate to different things and thus operate as different sources of authority. *Id.* The majority's reading essentially eliminates subparagraph (1) from the statute as any law enforcement officer with the authority to make "an arrest in the county of execution" would already have the authority to do so in an adjacent county.

The first paragraph relates to geography, not identity of the person tasked with delivering the warrant. It would thus appear to authorize (at a minimum) the judge to appoint a law enforcement officer, himself, or *anyone else* to make delivery—provided the burden is limited to delivery in an adjacent county. The second paragraph authorizes the judge to task *law enforcement* with delivery without geographic constraint and in keeping with its statewide scope of constitutional authority and the State's interest in seeing its criminal laws enforced.

While the majority's reading of "and" as a linkage of two preconditions on the authority to deliver the warrant is also grammatically plausible, *e.g.*, *id.* at 124, it should be rejected because it renders the first condition inoperative or practically impossible. *Id.* If subparagraphs (a) and (b) confer authority to serve the warrant

---

(1) in any county adjacent to the county in which the warrant was issued; and

(2) by any law enforcement officer authorized to make an arrest in the county of execution.

collectively and conditionally rather than sequentially, how could a blood-draw warrant be served in the same county it is issued?  Likewise, how, under the majority's reading, might a blood draw might be ordered if the inebriated driver operator makes it across the adjacent county?

Suppose for example a driver under the apparent influence is involved in a fatal accident in south-eastern Hunt County and is taken across neighboring (and diminutive) Rockwall County to a critical care facility in Dallas County.  What then?  Under the majority's reading subparagraph (1) must be satisfied separately from subparagraph (2).  The warrant can be issued only from a county *adjacent to* the county of execution, meaning Rockwall, Ellis, Tarrant, and Collin, *but not Hunt*.  And, if we could somehow authorize a judge in a county disassociated with the event to issue the warrant he would also have to be sufficiently "adjacent," ruling out Dallas as well.  This would then also preclude any law enforcement officer within that same county from serving the warrant to the hospital staff because they were not "present" and did not "observe" the offense.

I do not mean to suggest that the majority's reading is absurd, only that we should favor a reading that makes sense, leaves both subparagraphs as operative, and avoids the constitutional and practical concerns to which I will now turn.

Yet another simple and avoidable reading here would focus on the question of "execution" of the warrant. While that term is not defined in the statute, the warrant's object—the taking of blood—is obvious. The judge's authority to sign a warrant is just as obvious. The only question is whether "executed" means "delivery" or actually taking the specimen. Before we answer that question, we should accept that the legislature was aware that the officer had the authority to hand the warrant to anyone else, say a nurse, for purpose of its "execution." The Code of Criminal Procedure says so explicitly in the same chapter as to "search warrants" generally, and we should assume the legislature was aware of that provision when it enacted Article 18.067. TEX. CODE OF CRIM. PROC. art. 18.08 ("In the execution of a search warrant, the officer may call to his aid any number of citizens in this county, who shall be bound to aid in the execution of the same."); *Harris County v. S.K. & Bros., Inc.*, No. 14-17-00984-CV, 2019 WL 5704244, at *4 (Tex. App.—Houston [14th Dist.] Nov. 5, 2019, pet. denied) (mem. op., not designated for publication) (legislature presumed to be aware of its own enactments).

In my view, there is no need to revisit *Woodard* in this case, because the relevant statute did not constrain service of the warrant on account of Officer Ibarra's authority to make an arrest. All that it required was that it be served in a

neighboring county. Moreover, because the record does not show Officer Ibarra did anything beyond delivering the warrant, his power to arrest is irrelevant.[12]

### C. *The Majority's Construction Presents Serious, Big-Picture Problems We Should Not Ignore.*

Quite apart from its avoidance of the controlling question and its textual challenges, the majority's opinion leads us into a veritable minefield of broader and smaller concerns.

### i. *We are obliged to avoid constitutional issues where alternate constructions that do not violate the Texas Constitution are possible.*

There are serious structural implications of the majority's efforts to use this case as the vehicle for revisiting *Woodard*. *See* TEX. CODE CRIM. PROC. art. 14.01(b); *Woodard*, 341 S.W.3d at 414. According to Article V, Section 12 of the Texas Constitution, **"*All judges* of courts of this State, by virtue of their office, are conservators of the peace *throughout the State*."** TEX. CONST. art. V, § 12 (emphasis added). Whether and to what extent this provision would forbid legislation constraining judicial authority is a question we are obliged to be mindful of (and preferably avoid) as we undertake statutory construction that might infringe upon it. *See* TEX. GOV'T CODE § 311.021(1) (listing as first principle of statutory

---

[12] As a textual matter, the statute may authorize an officer to draw blood where he could also make an arrest in a county other than one adjacent to the county of issuance.

interpretation that compliance with Texas and federal constitutions is presumed when a statute is enacted); *State v. Edmond*, 933 S.W.2d 120, 124 (Tex. Crim. App. 1996) (citing *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court's] duty is to adopt the latter.").

As detailed above, there are many plausible alternative paths to this case and our reading of Articles 18.067 and 38.23 that avoid this problem.

### ii. Assuming we abandon Woodard, what then?

The majority rejects *Woodard*'s liberal application of the arrest power's limitation to offenses taking place within an officer's "presence" or "view." Whatever its deficiencies, *Woodard* has conferred a relatively broad and workable reach for more than fifteen years. Meanwhile, police officers have been told not only that they possess the power but also are directed by force of duty to act and arrest statewide, whether on duty or off and whether within their geographic jurisdiction or not, whenever they perceive that an offense has been committed in their presence or view. *See Garza*, 574 S.W.3d at 402–04 (quoting *Blackwell v. Harris Cnty.*, 909 S.W.2d 135, 139 (Tex. App.—Houston [14th Dist.] 1995, writ

denied)) (citing TEX. CODE CRIM. PROC. arts. 6.06, 14.03(g)(2)) (duty to stop crime applies "twenty-four hours a day" and throughout the state).

To effectuate that obligation police are instructed to summon "any number of the citizens of his county to his aid." TEX. CODE CRIM. PROC. art. 6.06.

In its enthusiasm for attacking *Woodard*, the majority does not ask, much less answer, whether Judge Chambers's *constitutional* authority does not possibly extend to a like extent to persons, including and especially law enforcement officers within his county, to serve papers "throughout the state." TEX. CONST. art. V, § 12.

iii.     *What happened to our old friend legislative acquiescence?*

The Legislature has revisited and amended Chapter 14 and Chapter 18 several times since our decision in *Woodard*. A majority of this Court has recently held that the canon of legislative acquiescence is alive and well. *See In re Green*, 713 S.W.3d 843, 852 (Tex. Crim. App. 2025). Where did it go? Why are we not assuming that the legislature was aware of *Woodard* and, by inaction, embraced it?

Whether we now like *Woodard* or not, the legislature drafted this linkage between Article 18.067 and Article 14.01 with presumed knowledge and acceptance of this Court's holding in *Woodard*. Rejecting it now serves only to ambush the parties, Officer Ibarra, Judge Chambers, and the court of appeals, and prompts

constitutional concerns that we are obliged to avoid where alternate, reasonable constructions are possible.

       *D.*     *I Also Decline to Join Our Smaller-Picture Battle with Woodard.*

In my view, the majority's disposition here violates *what should be* our version of the Hippocratic Oath: to first do no harm; and certainly *not* do harm for the purpose of delaying and impeding the merits of one case that will never be repeated.

The majority embarks on a different path, using this case to relitigate *Woodard* and reject its holding, leaving nothing but potential confusion over how and when an "offense" is "viewed" or "observed," and its myopic focus on the words "viewed" and "observed" is a mistake because, although they seem plain enough when plucked from the statute, they appear to be ambiguous when read in context.[13]  As noted, law enforcement officers, prosecutors, defense attorneys, and lower court judges will all be busy wondering what the new rule is.

The majority appears to retreat to some notion of sensory experience that would include some unspecified number of the five senses that may allow this

---

[13] The majority's analysis is like a Scrabble game—one word at a time—but "[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . ." *N.L.R.B. v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941).

statute to survive an attack under the Americans with Disabilities Act by allowing the State to employ the hearing or visually impaired to serve as law enforcement officers. Maj. Op. at 11 ("An offense is deemed to have occurred within the presence or view of an officer when any of his senses afford him an awareness of its occurrence."). One wonders how an officer "experiences" driving while intoxicated, elder abuse, or any crime involving *inaction*, such as injury to a child by omission.

Does "viewed" or "observed" mean a peace officer must observe the elements of a crime? How many must an officer experience through his senses?[14] What if the officer sees an actor engaging in conduct (all or perhaps only some of which would be elements sufficient to amount to an offense) like robbing a bank and then entering a vehicle to leave the scene. Can the driver be arrested on view for committing an offense in the presence or view of the officer without the officer

---

[14] Section 1.07 of the Penal Code defines the elements of offenses in Texas:

(A) the forbidden conduct;

(B) the required culpability;

(C) any required result; and

(D) the negation of any exception to the offense.

TEX. PENAL CODE § 1.07(a)(22).

"experiencing" that the driver is mentally linked to the robbery (i.e., he's not an Uber driver)? After all, one element of most crimes is that the defendant had the requisite *mens rea*. *See* TEX. PENAL CODE § 1.07(a)(22)(B) (requiring that a defendant must have the required culpability as an element of the offense).

Also, the majority spends considerable time trying to figure out what "presence" and "view" mean, but it never addresses "offense" in Article 14.01. *Woodard* tried to construe Article 14.01 in a way that would apply to all criminal offenses, but today the majority seems to construe the statute—as shown by my examples and questions above—with only this case's offense on its mind.

Ultimately, this case serves as another illustration of this Court's preference for small point debate that ends up causing more problems than it solves.

### i. Ad Hominem

Officer Ibarra, Judge Chambers, the prosecutor, and the court of appeals all did what they were supposed to do. They followed this Court's binding precedent. They should be commended, not condemned or burdened with a remand and further delay.

Sometimes it is incumbent on us to change the law, but the effect of doing so here works an injustice on the State by post hoc pitch shifting; a change no one could have anticipated until the majority handed down its opinion today and that

could result in the blood evidence being suppressed.  I also firmly believe any aspersions cast on the court of appeals for making an "obviously" wrong decision are unwarranted and unnecessary.  *See* Maj. Op. at 2.

### III.    FINAL THOUGHTS

The bottom line is the resolution of this case is stalled by a ruling excluding the results of the blood draw, despite the validity of the warrant issued by a neutral and detached magistrate, on account of its being delivered in Harris County at a hospital by a Liberty County police officer who undertook the effort to bring the information to the magistrate and, in turn, drive to and deliver the warrant in a neighboring county. And an important issue that needs to be addressed—but has not been by the majority—is application of Article 38.23

Mr. Allen is dead.  He shouldn't be.  There is probable cause to believe Barber's driving while intoxicated was the cause.  There is no colorable basis for any decision that would exclude the proof of his drinking in connection with the event.  I'd end things there.

### CONCLUSION

I would affirm the judgment of the court of appeals.

Filed: April 16, 2026

Publish